## Wendling v. Commonwealth.

(Decided May 11, 1911.)

### Appeal from Jefferson Circuit Court (Criminal Division).

1. Criminal Law—Jury de medietate linguae—Is one composed half of aliens and half of citizens; and it is provided in section 2254 of the Kentucky Statutes that such a jury may be directed by the court.

2. Alien—Right of, to Demand Jury de Medietate Linguae—Discretion of the court—An alien is not entitled as a matter of right to such a jury, but the trial judge may in his discretion order one upon the request of an alien charged with crime; but, whether he does so or not is entirely within his discretion, and his refusal to order such a jury would not in any case be reversible error.

3. "Trial by jury" defined—When a person is put upon his trial in a court presided over by a judge, who directs the proceeding, and before a jury composed of twelve men, and they all agree upon the verdict, the accused has had a trial by a jury according to the ancient mode, and cannot complain that any constitutional right has been denied him merely because the qualifications of the jurors or the manner of their selection differs from what

it was at common law or is changed from time to time to make the system more efficient.

4. Jury Commissioners—Duties of—Challenge to Panel—Practice—Presumption—It is the duty of the jury commissioners to write the names of the jurors on slips of paper and place them in the cylinder or wheel; and if this service is performed by clerks or others, it is ground of challenge to the panel. But a motion to discharge a panel because the jurors were not properly selected by the commissioners must be supported by affidavit or other proof that the commissioners did not properly discharge their duty—the presumption that they did is not to be overthrown by a mere motion, unsupported by affidavit or proof.

5. Circumstantial Evidence—Where the Commonwealth must establish the guilt of the accused, if at all, by circumstantial evidence alone, a wide range must necessarily be allowed in the examination of witnesses, and every relevant fact and circumstance that tends to connect the accused with the commission of the offense may be submitted to the jury for their consideration.

6. Evidence—Duty of Court to Pass upon Competency of—It is the duty of the court to pass upon the competency of the evidence, and to determine for himself whether the evidence offered should be permitted to go to the jury; but, it is admissible in some instances for the court to instruct the jury at the time concerning the purpose for which evidence is admitted and leave it to them to say whether or not it is applicable to the issues.

7. Instructions—Verbal admonitions of the court made during the progress of the trial in reference to questions of evidence, are not instructions within the meaning of the Code provision requiring all instructions to be in writing. The Code refers to instructions that are given at the close of the evidence.

8. Evidence—Right of Accused to Inspect Articles Proposed to be Offered as Evidence by the Commonwealth—It is not encumbent upon the Commonwealth to submit before trial for the inspection or examination of the accused articles in possession of the Commonwealth that it proposes to introduce as incriminating evidence against him; but it is proper to give the accused and his counsel full and free opportunity to examine them during the trial.

9. Confessions—Where statements are made out of court by the accused that might be construed to incriminate him, although it may not clearly appear that they were confessions, it is not error for the trial court to instruct the jury upon the subject of confessions.

10. "Public Trial"—The constitutional right to a public trial does not mean that all of the public who desire to be present shall have opportunity to do so, or that the trial judge may not without favor or discrimination limit the spectators to the capacity of the room in which the trial is had; and, where the orderly

conduct of the trial requires it, the court may have policemen or officers stationed at convenient places to preserve order, and limit admissions to the court room to persons holding tickets of admission.

J. REGINALD CLEMENTS and JOHN W. RAY, for appellant.

JAMES BREATHITT, Attorney General, and TOM B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant, Wendling, is a native and citizen of the republic of France. He emigrated to this country in 1907 and located in Louisville, Kentucky, where he was soon afterwards married. In the early part of November 1909, he obtained employment as janitor at Saint John's Catholic Church in Louisville, and his wife was also employed as the housekeeper of the priest in charge of the church. In June, 1910, he was indicted by the grand jury of Jefferson County, charged with the crime of murdering Alma Kellner, a child between eight and nine years of age. Under this indictment he was convicted, and his punishment fixed at confinement in the State prison for life.

In the lower court he filed a number of grounds for a new trial, but we will only notice such of them as are relied upon by his counsel in this court in argument and brief, as the other grounds assigned in the motion for a new trial do not seem to be of sufficient importance to justify us in setting them out in the opinion.

When the case was called for trial, his counsel in writing moved the court to empanel "a jury de medietate linguae" to try the prosecution against him—resting his motion upon the ground that appellant as an alien was entitled, under the Constitution and laws of this Commonwealth, to such a jury. The trial judge overruled his motion and put him upon trial before a jury selected in the manner provided in the statute for the trial of criminal cases. The refusal of the court to grant this motion is one of the principal errors assigned, and will be disposed of before considering the other grounds presented for reversal.

Section 2254 of the Kentucky Statutes, found in the chapter relating to jurors, their mode of selection and qualifications, provides that—

"Juries de medietate linguae may be directed by the court" and it is this section that counsel relies upon as entitling him as a matter of right to demand such a jury. The right of an alien to demand a jury de medietate linguae is for the first time presented to this court for its consideration and an examination of the published opinions of other courts discloses the fact that in very few reported opinions has it ever been considered by a court of last resort in the United States. In North Carolina, in 1825, the question was presented to the Supreme Court of that State in the case of the State v. Antonio, reported in Hawk's Reports, Vol. 4, page 200, and the court denied the right of an alien to demand such a jury. In the People v. McLean, a case decided by the Supreme Court of New York in 1807 and reported in Johnson's Reports, Vol. 2, page 380, the trial court allowed the prisoner the privilege of a jury de medietate linguae, and in a brief opinion the court said that it was proper to do so. In the case of Respublica v. Mesca, found in Dallas' Reports, Vol. 1, page 73, a Pennsylvania court of oyer and terminer granted the request of alien prisoners for a jury de medietate linguae. In Richards v. Commonwealth, decided by the Supreme Court of Virginia in 1841, and reported in 11 Leigh, page 690, the question of the right of an alien prisoner under a statute like ours to a jury de medietate was elaborately considered, and the court held that the right to order such a jury was within the discretion of the trial court.

A jury de medietate linguae is one composed half of aliens and half of denizens, and by an ancient act of Parliament an alien might claim as a matter of right both in civil and criminal cases such a jury. Blackstone's Commentaries, Vol. 3, page 361; Bouvier's Law Dictionary, Title Jury; Forsythe's History of the Law of Juries, page 228. But, it is obvious from the scanty mention of juries of this character by the common law writers as well as the dearth of court opinions that the practice of allowing such a jury had grown into non-use in England long before the establishment of this government; and the fact that a law so antiquated and obsolete should be found incorporated in the statutes of this State, may well be regarded as one of the curiosities of legislation. But the section as it now stands was in the General Statutes adopted in 1873, the Revised Statutes adopted in 1854, and seems to have been handed down

from an act of the Legislature adopted in 1796 that may be found in Littell's Laws, volume 1, page 476. It will thus be seen that a law for which there was never any reason in the jurisprudence of the State has been retained from its earliest history in every compilation of the statutes. It stands now and has always stood apart from all other sections of the statute relating to the selection of juries, and has never had any orderly connection with the elaborate system of laws treating of this subject, that have' from time to time been enacted. Not only so, but this privilege allowed aliens is and has always been contrary to the spirit of American institutions and the public policy of this country. No good reason can be assigned why an alien who takes up his abode with us should not be tried for an offense against our laws in the manner and form provided for the trial of other offenders, or why any privilege or preference should be extended to aliens that is not extended to citizens; and, if the right to such a jury was not recognized by the statute, we would have no hesitation in denying it. But as the right to this jury is conferred alone by the statute, so by the terms of the statute the correctness of the ruling of the trial court is to be judged as the right to demand a jury de medietate linguae is not guaranteed either by the Constitution or by the common law as expressed in it. While it is true that in the early history of England a statute for the encouragement of emigration was enacted that gave to aliens the right both in civil and criminal cases to such a jury, the reasons for the adoption of this statute were local in their nature, and it is not to be considered as a part of the body of the common law brought over to this country and that yet prevails in this State. The common law right of trial by jury is preserved in the Constitution, but that instrument does not attempt to regulate the manner in which jurors shall be selected or the qualifications they must possess, nor does it describe or designate the character or class of persons who must compose a jury. It merely declares in section 7, that—

"The ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this Constitution."

And so, when we wish to ascertain what is meant by the right of trial by jury as expressed in the Constitu-

tion, we turn for information to the common law, where the right originated and from whence it came to us. In looking to this source for information we find it laid down in Blackstone's Commentaries, volume 3, page 350, et seq., and in Hale's Pleas of the Crown, volume 1, page 33, that the essential features of a trial by a jury were the right of the accused in a criminal or penal case to demand, when put upon his trial in a court of justice presided over by a judge, that he be tried by a jury of twelve men, and that all of them should agree upon a verdict. These were the fundamental principles intended to be and that have been preserved inviolate. The qualifications of the juror or the manner or mode of his selection, were never regarded as being controlled by this section, which is similar to that found in the Constitution of the United States as well as in the constitutions of the other States of the Union. In Capital Traction Co. v. Hof. 174 U. S., 1, 43 L. Ed., 873, Justice Gray in an exhaustive opinion discussing the right of trial by jury, said:

" ' Trial by jury' in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of twelve men before an officer vested with authority to cause them to be summoned and impaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinon it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion. Yet there are unequivocal statements of it to be found in the books."

In Thompson v. State of Utah, 170 U. S., 343, 42 L. Ed., 1061, the court had occasion to consider the constituent elements of a common law jury, and in the course of an elaborate opinion by Justice Harlan, it is said:

"So, in 1 Hale's P. C., 33: 'The law of England hath afforded the best method of trial that is possible, of this and all other matters of fact, namely, by a jury of twelve men all concurring in the same judgment, by the testimony of witnesses viva voce in the presence of the judge

and jury, and by the inspection and direction of the judge.' It must consequently be taken that the word 'jury' and the words 'trial by jury' were placed in the Constitution of the United States with reference to the meaning affixed to them in the law as it was in this country and in England at the time of the adoption of that instrument.'' See further, Cooley's Constitutional Limitations, page 391.

We, therefore, conclude that when a person is put upon his trial in a court presided over by a judge who directs the proceedings and before a jury composed of twelve men, and they all agree upon the verdict, the accused has had a trial by a jury according to the ancient mode, and can not complain that any constitutional right has been denied him merely because the qualifications of the jurors or the manner of their selections differs from what it was at common law or is changed from time to time to make the system more efficient.

Having this view of the matter, it follows that the only remaining question is—does the statute require that a jury de medietate linguae shall be granted as a matter of right when requested, or, is it a privilege left to the discretion of the trial court. The statute provides that such a jury ''may be directed by the court''— not that it shall be; and when we consider that there is every reason why such a jury should not be allowed, and no apparent reason exists why it should, we think that the disposition of the matter should be left to the discretion of the trial court, subject to review by this court in any case in which it is made clearly to appear that the discretion has been abused. Being of the opinion that the trial court did not in this case exceed his discretion we decline to disturb his ruling on this matter.

Another error assigned is the refusal of the court to sustain a challenge to the penal of jurors selected to try the appellant. It appears from the record that the appellant by motion—

''Challenges the array of special jurors summoned for this day, and moves the court to quash the venire therefor, because these jurors were not selected as provided by law. He says he is informed and upon such information says that the names of these jurors were not selected and copied from the Assessor's book by the jury commissioners in person but that said act was done by

another and not in the presence of or under the direct supervision of the commissioners.''

We held in L., H. & St. L. Ry. Co. v. Schwab, 127 Ky., 82, that it was the duty of the jury commissioners to write the names of the jurors on slips of paper and place them in the cylinder or wheel, and that if this service was performed by clerks or others, it was ground of challenge to the panel; and upon it being made to appear by affidavit or proof that the jury was not selected by the commissioners in the manner provided by law, the panel should be discharged. But the motion made by counsel was not supported by affidavit or other proof, and, therefore, we think the court properly overruled it. The jury commissioners are officers of the court, and the presumption is that they performed their duty in the manner required by law. This presumption is not to be overthrown by a mere motion setting out that they did not properly or faithfully discharge their duties. If a party to a civil or criminal proceeding desires to attack the validity of the acts of the jury commissioners, he should present or offer to present to the court some evidence, in the form of affidavits or otherwise, that they did not discharge their duties in the manner provided by law. Where it is attempted to challenge their acts by a motion only, the court is not obliged to presume that its officers neglected or failed to perform their duties, nor is it required to put them upon proof that they did. There must be some showing of neglect or failure of duty presented to the court before it becomes necessary for the court to order an inquiry into the manner in which the jurors were selected. Here we are asked to say that the court erred in refusing to sustain a challenge to the panel when there is no issuable statement of fact in the record that would justify us in looking into the question or enable us to determine whether or not the court abused its discretion.

Another error complained of relates to the testimony offered on the trial, and this makes it necessary that we should briefly state the facts so that the point of the objection may be apprehended. Alma Kellner on the morning of December 8, 1909, left her home for the purpose of attending mass at Saint John's Catholic Church, a short distance from where her parents lived. On her way to church she was seen and recognized by two or three persons, who knew her, and other witnesses tes-

tify to the fact that a child dressed as she was shown to have been was seen during the service in the church. The services which she attended were over about 10 o'clock in the morning, but the child did not return to her home; and in the afternoon of that day her parents, becoming alarmed at her absence, instituted a search for her, but without success. Her sudden and mysterious disappearance created great excitement in the city, large rewards were offered for information concerning her, and the entire police force of the city as well as many other persons made diligent efforts to find her. These efforts continued without intermission from December 8, until May 30, 1910, when a workman temporarily employed in the basement of the church found near the furnaces the remains of a partially burned human body. He at once gave information of his discovery, and thereupon an extensive search in and about the basement of the church was instituted that resulted in the finding of shoes, gloves and other articles of clothing that were subsequently identified as having been worn by Alma Kellner on the day of her disappearance. The body when found was partially decomposed, as well as partially burned, and some parts—one hand and one foot—were missing, but there was enough remaining in connection with the clothing to satisfactorily establish that the body was that of Alma Kellner. At the time Alma Kellner disappeared the appellant, as janitor, had exclusive charge of the basement of the church and the furnaces, and was the only person who performed janitor services in and about the building. He remained as janitor, discharging his usual duties, until the evening of January 14, 1910, when, without notice to Father Schuhmann, by whom he was employed, and who was the priest in charge of the church, or any one else, he suddenly disappeared from the city. It is not shown that at the time of his disappearance he was suspected of the crime, but the discovery of the body in a place in the church building that he had exclusive control of, and that was rarely visited by any other person, in connection with his unaccountable disappearance, caused suspicion to attach to him as the perpetrator of the deed; and, soon thereafter through the vigilance of the police he was located in the State of California and brought back to Kentucky for trial. On the trial, Father Schuhmann testified that in the afternoon of January 14, between 2 and 4 o'clock,

Frank Fehr, a relative of the child, and who had been and was then taking an active interest to learn what had become of her, called to see him in his residence at the church, and after a short conversation they went into the auditorium of the church and there engaged in conversation. He testified that he did not see Wendling in the church at the time, and did not think he was there. Fehr, when introduced as a witness, was asked the following questions and made the following answers:

"Q. I want to ask you if you were over in the church, while you were standing in the sanctuary close to the sacristy door—if you had a conversation with Father Schuhmann there? A. Yes, sir Q. Was the janitor there at that time in your sight, was any one present? A. I remember after we entered the church through the sacistry on the east side of the building, I remember seeing a man that was apparently performing the duties of janitor, but I didn't see his face. Q. I will ask you what you said to Father Schuhmann if it was said in the presence of the man that was acting as janitor. * * * A. After we entered the church, got into the church proper, Father Schuhmann and I stood there directly in front of the altar communion railing, which I judge to be twenty feet from the altar; I asked him quite a number of questions, and two questions I remember very distinctly. I asked him all about his help. He told me that he had a janitor. I then asked him whether his janitor was a white or colored man. He told me he was white. Seeing the registers in the floor, I asked him also about the heating apparatus, which he explained to me at that time, and I can't recollect the answers he gave me at that time. That practically completes my recollection relating to the important parts of the interview. Q. Was that conversation within hearing distance of the man you say was performing the duties of janitor? A. I talked loud enough so a man present could understand me fully fifty or sixty feet from where we were standing. Q. About how far was this man that you say was working about the church standing from you at that time? A. He couldn't have been exceeding twenty or twenty-five feet."

All of this evidence was objected to by counsel for the appellant upon the ground that it was not shown that appellant was in the church or heard any part of the conversation between Father Schuhmann and Fehr. But

the court overruled the objection and at the time orally instructed the jury as follows:

"Gentlemen of the jury: The answers just given relative to this conversation with Father Schuhmann can be considered by you if from this evidence you believe that the person descrbed as performing—apparently performing—the duties of janitor was the defendant in this case, Joseph Wendling, and if these statements were made in his hearing. If you believe, however, that the person described by Mr. Fehr as performing the duties of janitor was not Joseph Wendling, or that the statements were not made in his hearing, you should disregard them and not consider them as evidence in this case."

To this statement of the court exception was also saved. It is also proper to add that Wendling testified that he was not present in the church on the occasion mentioned, and did not hear any of the conversation between Father Schuhmann and Fehr. It is now the contention of counsel for appellant that it was error for the reasons stated to admit the evidence of Fehr, and that the court committed further error in submitting to the jury the question whether or not they should accept Fehr's statement as evidence against the appellant. We think the statements of Fehr were competent and relevant as tending to show that appellant became alarmed at inquiries direvted to the condition of the basement of the church, and the apprehension that these inquiries might lead to a more thorough examination of the basement, induced him to leave the church and city under the circumstances that he did. The evidence of Father Schuhmann corclusively established that appellant was the only person about the church who performed janitor service; and when Fehr testified that the person he saw in the church was performing this service and was near enough to hear his conversation with Father Schuhmann, appellant was sufficiently connected with the transaction to make what was said admissible as evidence against him. In cases like this, where the Commonwealth must establish the guilt of the accused, if at all, by circumstantial evidence alone, a wide range must necessarily be allowed in the examination of witnesses, and every relevant fact and circumstance that tends to connect the accused with the commission of the offense charged against

him may be submitted to the jury for their consideration. As this evidence was competent, the court might well have left it to the jury without admonishing them as to the condition under which it could be received as evidence against the accused. But, as the admonition of the court directed the attention of the jury sharply to the fact that they must not consider the statements of Fehr as evidence against the accused unless they believed they were made in his presence and hearing, it is manifest that the admonition of the trial judge was favorable and not prejudicial to him. It is of course the duty of the judge to pass upon the competency of evidence and to determine for himself whether the evidence offered should be permitted to go to the jury. But it occasionally occurs in the course of a trial that evidence offered to be introduced is only admissible for a particular purpose, as for example the impeachment of a witness, or its competency depends upon the existence of other facts that are put in issue. And so when questions like this arise, it is regarded as good practice for the trial judge, after ruling the evidence competent, to direct the attention of the jury at the time to the purpose for which the evidence is admitted and the conditions under which it may be received by them. This practice does not confer upon the jury the right to determine the competency of the evidence, but rather the right to say whether or not it is applicable to the issue; and we would be very reluctant to hold that efforts on the part of the court to guide in this manner the jury in arriving at a correct understanding of the relevancy of evidence was reversible error. In Magan v. Commonwealth, 119 S. W., 734, the question was raised that Magan, who was upon trial for murder, was not to be held accountable for incriminating statements made by Hardwick, who was associated or implicated with him in the difficulty under investigation, unless he assented to them; and the court said:

"If upon another trial the same evidence is offered, the court should admonish the jury that it is only competent against Magan if they believe from the evidence beyond a reasonable doubt that he consented to what was said by Hardwick in his presence, and then only for the purpose of showing motive and intent."

Admonitions of this character made by the court to the jury during the progress of the trial have never been

regarded as instructions within the meaning of section 225 of the Criminal Code, which provides that all instructions shall be in writing. The Code provision has reference to instructions that are given at the close of the evidence, and before the case is submitted to the jury.

It is further insisted that the court should have permitted Dr. Ellis Duncan, the coroner of Jefferson County to testify that during May and June, 1910, a number of decomposed bodies were found on the public dumps of the city. where they had been hauled from medical schools. We are unable to perceive what relevancy this offered evidence had to the matter under investigation. There was no attempt to show that any bodies or parts of bodies from any medical school or elsewhere were ever found in the basement of the church; nor was there any evidence that any person had at any time attempted to place bodies or parts of a body from medical schools in this building. The only body ever found there was the one identified as the body of Alma Kellner, and evidence of what was found on the dumps of the city was entirely foreign to the issue.

It was also assigned as error that the court refused to permit counsel for appellant to show by Father Schuhmann that the law of the Catholic Church provided that a church that had been desecrated by the commission of a crime should be re-consecrated before church service was held in it, and that there had been no re-consecration of this church. We are unable to understand how this evidence, if it had been introduced, could have thrown any light upon the question of the guilt or innocence of appellant, and upon this point we have not been furnished with any reason by counsel. It seems plain that the admission of this evidence would have introduced in the case a matter that had not the remotest connection with the subject being investigated.

It is further complained that the trial court refused to require the Commonwealth to produce before trial for the inspection of the accused and his counsel clothing and other articles that were subsequently introduced as evidence by the Commonwealth. We are not prepared to say that the court abused a sound discretion in refusing this request. We know of no practice that makes it incumbent upon the Commonwealth to submit before the trial for the inspection and examination of the accused or his counsel articles in the possession of the Common-

wealth that it proposed to and will introduce as incriminating evidence against him, but both the accused and his counsel should have full and free opportunity to examine them when offered as evidence. We may further add that in this case the accused and his counsel knew before the trial that these articles were and that they would be offered as evidence and had full and free opportunity to examine them during the trial, and so the accused was not prejudiced by the refusal of the court to permit an examination of these articles before they were offered as evidence.

On the trial it was proven that appellant in the presence of witnesses voluntarily stated in substance that— "If I did kill that girl, nobody saw me but God, and he can't come down and tell it; I am pure, I am innocent; I will go back without papers, and when I go back I will tell who done it; me kill no little girl; if I did kill her, nobody saw me do it but God, and he can't come down and tell it."

And it is now insisted that the court erred to the prejudice of appellant in instructing the jury that —

"If they believe from the evidence to the exclusion of a reasonable doubt that any statement or statements detailed in evidence as having been made by defendant amounted to a confession by him of guilt of either or any of the offense referred to in the foregoing instructions, they are instructed that a confession of the accused, if any there was, unless made in open court, will not warrant a conviction unless accompanied with other proof that such an offense was committed."

It is said that the declarations of appellant did not amount to a confession and, therefore, no instruction upon this feature of the case should have been summitted. The trial judge in the opinion overruling the motion for a new trial, said upon this point:

"There being a difference of opinion between counsel for the Commonwealth and defendant as to whether or not defendant's statement amounted to a confession, defendant being a foreigner, speaking the language quite imperfectly, the court deemed it due to him to qualify the usual instruction upon the subject of a confession by submitting to the jury whether or not they believed to the exclusion of a reasonable doubt that any statements made by him amounted to a confession. The meaning of

this particular statement was one about which a wide difference of opinion might well exist, and did exist, as shown by the argument of counsel in this case. If the court had failed to give an instruction upon the subject of a confession, it might well have been contended by defendant and his counsel that he had been prejudiced by reason of the fact that this statement was assumed by the Commonwealth, and argued by counsel for the Commonwealth, to be a confession of guilt.''

We think the reasons given in support of this instruction are well considered. The statements made by appellant, although not strictly speaking confessions of guilt, were properly admitted as evidence; but as aptly said by the trial judge, they might have been accepted by the jury as confessions, and hence to guard against any harmful inference the jury might draw from them, the instruction advising the jury of the conditions under which a confession might be received as evidence of guilt was beneficial and not prejudicial to the accused.

Another complaint is that the appellant did not have such a public trial as was guaranteed by the Constitution. It appears that during the trial it was necessary to preserve order and prevent the court room from being over-crowded that policemen should be stationed at convenient places and that admission to the court room should be limited to such a number as it would comfortably accommodate. But at no time during the trial was any complaint made of discrimination against the appellant or his friends or others who were interested in his behalf, nor was any favoritism or partiality shown persons seeking admission. The only purpose of limiting the admissions to the room and of having policemen present was that the trial might be conducted in an orderly manner, and we are entirely satisfied that no constitutional right of the accused was infringed by the efforts of the trial court to preserve order and prevent confusion and disturbance. Nor did the direction of the court in these respects prejudice in any manner the rights of appellant. The provision in section 11 of the Constitution recognizing the right of an accused to have a public trial does not mean that all of the public who desire to be present shall have opportunity to do so or that the trial judge may not without favor or discrimination limit the spectators to the capacity of the room in which

the trial is had.  As said by Judge Cooley in his work on Constitutional Limitations, 6th Ed., page 379—

"The requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether."

In Jackson v. Commonwealth, 100 Ky., 239, 66 Am. St. Rep., 336, it was held not to be error for the trial judge, without discrimination or favoritism to direct the sheriff to have tickets to the court room limited in numbers to the seating capacity of the room, and to give them in the order in which requests were made to him for them.

The foregoing disposes of the assignment of errors made by counsel, and upon the whole case we feel satisfied that the appellant had a fair trial,and that no error to the prejudice of his substantial rights was committed. Nor did anything occur subsequent to the indictment or during the trial that denied to appellant due process of law, or that was violative of any right or privilege guaranteed to him by the Constitution of this State or of the United States.

Wherefore, the judgment is affirmed.