ASHLAND PUBLISHING COMPANY
and Huntington Publishing
Company, Petitioners,

v.

Honorable Kelley ASBURY, Judge, Boyd
Circuit Court, Division I, Respondent,

and

Roger Dean Gardner, Intervenor.

Court of Appeals of Kentucky.

Nov. 14, 1980.

John F. Billings, Vigor & Vigor, Paul C. Hobbs, Ashland, for petitioners.

William M. Mizell, Jr., Public Defender, Catlettsburg, Jack E. Farley, Public Defender, M. Gail Robinson, Kevin Michael McNally, Asst. Public Defenders, Frankfort, for respondent and intervenor.

Michael L. Judy, Gen. Counsel, Johnson, Judy & Gaines, Frankfort, for amicus curiae Kentucky Press Association.

Before COOPER, LESTER and WILHOIT, JJ.

### OPINION AND ORDER GRANTING PROHIBITION

WILHOIT, Judge.

This is an original action brought by the Ashland Publishing Company and the Huntington Publishing Company against the Honorable Kelley Asbury, Judge of the Boyd Circuit Court, in which the petitioners seek an order prohibiting Judge Asbury from closing the pretrial proceedings in a murder case. The petitioners allege that they are the publishers of the two major newspapers serving the Boyd County area and that they are therefore directly affected by the closure order. The defendant in the murder case was permitted to intervene in this action and the Kentucky Press Association to file an amicus curiae brief.

In the pending murder case, Roger Dean Gardner has been indicted for the murder of Georgia Lynn Oliver. Apparently, Mr. Gardner is a black man, while Miss Oliver was a white woman. This is alleged by the respondent in his pleadings to this Court, although these facts do not appear in any of the newspaper reports before us. The newspapers reported on May 10, 1980, that police had found Miss Oliver, 22, and that she had been stabbed to death in her apartment the previous evening. Mr. Gardner, 24, of the same address, was found lying unconscious nearby with multiple wrist and leg lacerations. The incident was described as an "apparent murder and attempted suicide." On May 12, 1980, it was reported that there had as yet been no arrests in the case, but a police sergeant's statement was quoted that "[w]e think we know what happened but we're trying to find the evidence to back it up." On May 15, 1980, it was reported that Mr. Gardner had been arrested for the murder of Miss Oliver. A newspaper report of May 20, 1980, told that Gardner, "accused of murder in the stabbing death of a former Boyd County High School cheerleader" had entered a plea of not guilty, and that Gardner was being held without bond. On May 23, 1980, a newspaper reported that Mr. Gardner's bond had been set at $100,000.00. On May 28, 1980, an article appeared describing the circumstances of the finding of Miss Oliver's body, simply stating that she had been found stabbed to death in her apartment and that Gardner was found lying unconscious nearby with multiple wrist and leg lacerations. The article also reported that defense counsel had moved to exclude the press, public and other media from pretrial hearings. On May 30, 1980, a news report described the opposition by the press to the motion to exclude it from the hearing on the bond reduction motion and quoted remarks of both the Assistant Commonwealth's Attorney and defense counsel made at the closure hearing. The petitioners refused to be bound by either the 1978 *ABA Criminal Justice Standards* or the 1965 *Fair Trial Reporting Code* adopted by the Kentucky associations of the bar, the news media, and the bench with respect to delaying the dissemination of certain pretrial information until after the jury was empaneled.

On June 10, 1980, the court entered its order adjudging

> that the public, press and electronic media be excluded from all pre-trial hearings involving evidentiary matters presented by only one side and from all pre-trial suppression of evidence hearings. Release of such transcripts may be made after a jury is empanelled and sequestered or after the trial.

The court found that there was a substantial probability or irreparable damage to the defendant's fair trial right by conducting these pretrial proceedings in public, that a closure order would effectively protect against irreparable damage, and that the right to a fair trial could not be protected by any less restrictive alternatives.

■ The first question which must be disposed of is whether an application for relief in the nature of prohibition is appropriate. We believe that it is. *See Lexington Herald Leader Co. v. Tackett*, Ky., 601 S.W.2d 905 (1980).

We are next presented with the question, which is the heart of this proceeding, whether the order closing all pretrial hearings involving evidentiary matters presented by only one side and from all pretrial suppression hearings violates the First Amendment to the United States Constitution and Sections 8, 11, and 14 of the Kentucky Constitution.

In *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), the United States Supreme Court held that the Sixth Amendment to the United States Constitution guaranteeing an accused the right to a public trial gave neither the public nor the press an affirmative right of access to a pretrial suppression hearing in a state criminal case. The Court declined to rule on the question of whether the First Amendment gave such a right although that question was specifically raised. The majority opinion did note, however, that the right of access under the First Amendment was acknowledged by the state trial judge who held that this right was outweighed in that case by the defendant's right to a fair trial. The Court appeared to find no fault in the result reached by the trial judge's "assessment of the competing societal interests involved." *Id.* at 393, 99 S.Ct. at 2912, 61 L.Ed.2d at 629.

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court held that the First Amendment as applied to the states by the Fourteenth Amendment guarantees the right of both the public and press to attend criminal trials. Looking to the First Amendment from an historical perspective, a majority of the Court seemed to agree with the Chief Justice that "[t]he right of access to places traditionally open to the public, as criminal trials have long been, may be seen as assured by the amalgam of the First Amendment guarantees of speech and press[.]" *Id.* at 577, 100 S.Ct. at 2828, 65 L.Ed.2d at 989–90. A majority of the Court also recognized that this right of access is not absolute and that it can be subject to some overriding interest.

As can be seen, neither of these cases specifically answers the First Amendment question before us. They tell us that the press and public have no Sixth Amendment right to attend criminal pretrial hearings but they do have a First Amendment right to attend criminal trials. So we shall turn to our own Constitution.

Section 8 of the Kentucky Constitution provides that "[p]rinting presses shall be free to every person who undertakes to examine the proceedings of the General Assembly or any branch of government, and no law shall ever be made to restrain the right thereof." Section 11 provides that "[i]n all criminal prosecutions the accused ... shall have a speedy public trial by an impartial jury of the vicinage[,]" and Section 14 that "[a]ll Courts shall be open ...."

These sections of our Constitution when viewed in the context of their history and of the history and traditions of our people can only be taken as an expression of the principle that justice cannot survive behind walls of silence and of an intent and spirit that there be a "presumption of openness"

to criminal proceedings in the courts.[1] This precept that courts shall be open embodies not only the idea that the courts shall be available to all citizens who seek redress for wrongs but that the courts shall be "public, open, no hiding place about them[.]" 1 *Official Report of the Proceedings and Debates of the 1890 Constitutional Convention* 500 (1890).

Over one hundred years ago, the highest court of this State, interpreting a section of the 1850 Constitution identical to Section 14 of our present Constitution, stated that the courts "are to be held in an open and public manner, and their proceedings are not to be secret or concealed from public view." *Johnson v. Higgins*, 60 Ky. 566, 570, 3 Met. 514, 518 (1862). More recently, that Court although not mentioning specifically any section of our Constitution, but certainly expressing its spirit, wrote:

It is insisted by some the right to public trial is solely for the benefit of the criminal defendant and if he has no objection to a closed trial then the public should not be permitted to object. *This contention overlooks the fact that the public is a party to all criminal proceedings.* The proceeding is prosecuted in the name of the the public. In our opinion there is nothing that better protects the rights of the public than their presence in proceedings where these rights are on trial.

*Johnson v. Simpson*, Ky., 433 S.W.2d 644, 646 (1968) (emphasis added). This language was cited with approval in *Lexington Herald Leader Co. v. Tackett, supra.*

The same policy which calls for openness in criminal trials also calls for openness in pretrial proceedings. Nevertheless, the right of the public and press to be present at criminal proceedings, even trials, is not absolute. Just as modern notions of what is embodied in the constitutional safeguard of a free press are much broader than what once was thought to suffice, so too have notions of what is embodied in the safeguard of a fair trial ex-

panded. Still, these two safeguards collide only when an extremist view is taken of either. Such views are foreign to the spirit of both the federal and state Bills of Rights and their "admonitions of moderation." L. Hand, A Plea for the Open Mind and Free Discussion, in *The Spirit of Liberty*, 274, 278 (2d ed., enl. I. Dillard 1953). As with the Bill of Rights of the Federal Constitution so with our own, the rights secured thereby are not self-destructive. The policy of openness in criminal proceedings is not intended to nullify the equally important guarantee of trial by an impartial jury. But "[t]he courtroom doors may be closed to the general public only on a rare occasion after a determination that in no other way can justice be served." *Lexington Herald Leader Co. v. Tackett, supra* at 906.

The problems faced by the courts in insuring fair trials are much different when deciding whether a trial itself should be closed than when deciding whether pretrial proceedings should be closed. Since juries can be sequestered, it would be a "rare occasion" indeed when a trial should be closed. On the other hand, sequestration is no remedy at all to prevent the circulation throughout a community or even the state at large of prejudicial information from a pretrial proceeding. We do not mean to imply that every criminal case is a cause célèbre; it obviously is not. The danger to a fair trial from pretrial publicity becomes acute only in those cases which excite widespread public attention, or are very likely to do so, and it is these cases which present the problem to the courts.

The very purpose of a suppression hearing, for example, is to prevent jurors from considering inadmissible prejudicial evidence. This purpose would likely be frustrated if the prejudicial information were known to some or all of the members of a jury panel before the trial even began. The only methods then available to guard against a jury which knows what it should not would be through voir dire, change of

1. We recognize that there may be other traditions with respect to certain civil proceedings

or juvenile proceedings.

venue, or perhaps continuance in the hope that prospective jurors would forget. The utility of voir dire is often questionable. *See Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Change of venue may not help if the information has been widely disseminated, while this method also presents numerous practical problems— availability of counsel, travel expense, etc. —as well as impinging upon the accused's constitutional right to a trial by a jury of the vicinage. Aside from the constitutional right to a speedy trial, the practical problems engendered to both the prosecution and the defense by a continuance of any great length are obvious—often prolonged pretrial confinement for the accused, fading memories for witnesses if they can still be located, etc. Yet there is little assurance that prospective jurors will not remember the prejudicial information which they have heard or read.

■ Taking into account the foregoing considerations, we believe that a pretrial hearing should be closed to the public and press only after a determination is made that there is a substantial probability that the right of the accused to a fair trial or his other constitutional rights will be otherwise irreparably damaged. If the evidence to be introduced at the pretrial hearing is found to be of a kind that would not be admissible at the trial itself, and if this evidence is not otherwise already known generally to the press and public, and the trial court reasonably believes that is dissemination to the public will probably irreparably damage the constitutional rights of the accused, then closure should be ordered. Many factors bear upon the danger of irreparable damage in any given case, and each must be considered on its own merits. Before ordering closure, however, the trial judge should consider the utility of other reasonable methods available to protect the rights of the accused short of closure. Of course, at the time the motion for closure is made or heard any member of the public or press who is then present and objects must be given an opportunity to be heard on the question. If closure is ordered, specific findings should be made setting out the need for closure.

■ In the present case, the trial judge adopted what we believe is the correct standard, "substantial probability of irreparable damage," but his order closing all pretrial hearings involving evidentiary matters presented by only one side is much too broad. Where the evidence presented by only one side is evidence which a jury will hear at trial anyway (plus any countervailing evidence presented by the other side), we do not believe that the accused's right to a fair trial would be irreparably damaged by permitting this evidence to be disseminated before trial. While the nature itself of suppression hearings would seem to weigh heavily in favor of their closure in many if not most instances, there is nothing in the record before us indicating what suppression hearings, if any, were to be held or the nature of the evidence to be presented or whether that evidence was already known to the press and public. For this reason we believe the blanket closure of suppression hearings is also too broad.

■ The trial judge's order that the transcripts of all closed hearings be made available to the public after the jury was empaneled and sequestered or after trial exhibited a thoughtful concern for the right of the public to examine the proceeding of its courts while seeking to protect the rights of an accused. Sound policy would seem to dictate the release of such transcripts when the danger of irreparable injury is past. The public's acquisition of information is delayed but not frustrated, and perhaps the commercial interest of the news media in current news is damaged slightly, but in weighing the competing societal interests this appears to be a fair price to pay for a fair trial.

We do not believe from our reading of the cases that the First Amendment requires anything beyond what we have found to be required by our own Constitution.

It is therefore ORDERED that the Respondent is PROHIBITED from enforcing the order of closure herein and that any

future order closing pretrial hearings in this case shall be entered only upon compliance with this opinion.

COOPER, J., concurs.

LESTER, J., concurs by separate opinion.

LESTER, Judge, concurring.

I believe this litigation to be of such significance so as to require comments upon several arguments made both orally and by way of brief by counsel.

My colleagues first approach the basic issue of press coverage of pretrial proceedings by "assessment of the competing societal interests involved" (Justice Stewart in *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2989, 61 L.Ed.2d 608, 629 (1979) quoting from Justice Powell's dissent in *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514, 525 (1974)). This test I consider to be appropriate in cases of this nature, but in order to make this assessment an examination of the nature of the litigants should be made in order to determine what their interests might be. Even though the avowed purpose of the media is that of surrogate of the people, nevertheless, it cannot be denied that generally it is a commercial enterprise which must produce an income, and in most cases, a profit, in order to sustain itself. This is usually accomplished primarily through the sale of advertising space which, along with news items, is disseminated through an area of circulation and, in a truly competitive situation, it is the publication that prevails which can spread the news at an earlier time. As opposed to this entity is one who stands accused of a crime who can lose his liberty for a specified time or even his life, if found guilty, who should have as protection for his rights an unbiased judge and panel of potential or actual jurors together with a competent advocate. By ascribing to the newspaper industry a monetary interest, I merely wish to point out that absent such an element it would be unable to survive in order to fulfill its role of public informant as is evidenced by the recent demise of many of its members. I now turn to the specific legal contentions of the petitioners.

The publishing companies urge reversal of the trial court first relying upon Sections 8, 11 and 14 of the Kentucky Constitution.

Section 8 of the Kentucky Constitution provides:

Printing presses shall be free to every person who undertakes to examine the proceedings of the General Assembly or any branch of government, and no law shall ever be made to restrain the right thereof. Every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty.

The order of the trial court does nothing to restrain access to printing presses or deny the right to fully and freely publish on any subject but it does prohibit the immediate examination and reporting of such pretrial proceedings where only one party, the prosecution, intended to adduce evidence. This temporary denial does nothing to infringe upon the right to utilize printing presses or examine judicial proceedings, but merely delays the exercise of those privileges to a time certain. This is certainly a balancing of the rights of the the defendant and those of the corporate bodies involved.

After delineating the rights of an accused, Section 11 provides that a defendant ". . . shall have a speedy *public* trial . . ." (emphasis added). It is the word "public" upon which petitioners claim they should be entitled to be admitted to pretrial proceedings, but this contention overlooks that, that particular provision addresses itself specifically to the rights of an *accused* and no one else. An examination of the cases dealing with Section 11 reflects that the provision has been interpreted only from the standpoint of rights of a defendant and not the public or press. See e. g. *Wendling v. Commonwealth*, 143 Ky. 587, 137 S.W. 205 (1911); *Beauchamp v. Cahill*, 297 Ky. 505, 180 S.W.2d 423 (1944). Therefore, Section 11 is of little aid to petitioners.

Petitioners urge that the transcript which would be made available to them after empanelment and sequestration of the jury

would be most likely to reflect the crucial tones, inflections, gestures, impatience or inattentiveness of a witness which constitute the "atmosphere" of the proceeding. Curiously enough, this is the precise manner in which a case reaches the appellate courts of this jurisdiction. What petitioners seem to be saying is that they should be free to inject into their accounts of proceedings certain editorial comments or observations which are nothing more than an interpretation of their representative who is present which may or may not be accurate. This could be especially damaging to a defendant seeking an objective jury panel when such comments could be made in the report of a hearing where only his adversary introduced evidence.

Petitioners also complain of the inconvenience and costs attendant upon acquiring transcripts, but we are unaware of any commercial venture that can be operated without some costs and vexation.

The third section of our constitution (§ 14) which the media claims supports its position, states:

All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

Petitioners rely upon *Johnson v. Higgins*, 60 Ky. (3 Metc.) 566, 570 (1862) to the effect that:

They [courts] are to be held in an open and public manner, and their proceedings are not to be secret or concealed from public view.

but this overlooks *Forrester v. Terry*, 357 S.W.2d 308, 310 (1962), citing Section 14 as meaning that "courts are always open for redress . . . ." The very language, or shall I say the meaningful language, of the provision clearly states that the courts shall be open to every person to seek a remedy for an injury done to him. To hold otherwise would require that we throw all adoption and juvenile matters open to the public scrutiny. I cannot overlook the fact that when *Johnson v. Higgins, supra*, was written in 1862 and the debates on the constitution of 1890 (cited by my Brother Wilhoit) were held there was no proceeding in the law known as pretrial hearings. Moreover, *Johnson v. Simpson*, Ky., 433 S.W.2d 644 (1968) and *Lexington Herald Leader Co., Inc. v. Tackett*, Ky., 601 S.W.2d 905 (1980), addressed themselves to the *trial* of criminal and juvenile cases as distinguished from matters of pretrial nature.

Attention has been directed to the recent decision of the Supreme Court of Appeals of West Virginia in *State ex. rel. Herald Mail Company v. Hamilton*, W.Va., 267 S.E.2d 544 (1980), dealing with the same subject matter as the cause before us. That court in construing Article III, § 17 of the West Virginia Constitution (which is nearly identical to § 14 of the Kentucky Constitution) in light of that state's open courts provision (Article III, § 14) found that pretrial proceedings are to be opened to the press. However, the *Herald Mail* case is distinguishable from the one at bar because West Virginia Justice Miller wrote that his Section 14 "does not couch the right to a public trial in terms of a right conferred on the defendant" while in this jurisdiction, by virtue of Section 11, the right to a public trial is guaranteed to the defendant. Therefore, I find little assistance in the opinion of our West Virginia colleagues.

In spite of the fact that I do not consider the several sections of our Constitution, either individually or collectively, as forming a basis for the relief requested, I do believe that the policy pronouncements of the majority to be sound in that there is a lesson to be learned from *Johnson, Lexington Herald Leader Co., Herald Mail Co., DePasquale*, all *supra, Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) and even *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), in that the better policy is that of openness of judicial proceedings. However, since reason requires temperance, I would subscribe to a rule that after a trial court has determined that there is no substantial probability that the right of the accused to a fair

trial or his other constitutional rights will not be otherwise damaged, then the press should should be permitted to attend and report the pretrial hearings only if the evidence adduced thereat would be proper in the trial of the case to determine, in whole or in part, the guilt or innocence, of the defendant, provided, however, that nothing contained in the publication should convey any innuendo whatsoever as to the innocence of guilt of the accused.