The LEXINGTON HERALD–LEADER COMPANY, INC. and Frankfort Publishing Company, d/b/a the State Journal, Appellants,

v.

Hon. Henry MEIGS, Judge, Franklin Circuit Court, Appellee.

The COURIER–JOURNAL AND LOUISVILLE TIMES COMPANY and Ann Pardue, Appellants,

v.

Hon. Henry MEIGS, Judge, Franklin Circuit Court, Appellee.

The LEXINGTON HERALD–LEADER COMPANY, INC., and Frankfort Publishing Company d/b/a the State Journal and the Courier-Journal and Louisville Times Company and Ann Pardue, Appellants,

v.

Hon. Henry MEIGS, Judge, Franklin Circuit Court, Appellee.

Supreme Court of Kentucky.

Aug. 31, 1983.

Rehearing Denied Dec. 22, 1983.

Jon L. Fleischaker, Sheryl G. Snyder, Kimberly K. Greene, Robert C. Ewald, Wyatt, Tarrant & Combs, Louisville, for appellants, Courier Journal and Louisville Times Co. and Ann Pardue.

Sam G. McNamara, Michael L. Judy, Frankfort, for appellants, Lexington Herald-Leader.

Henry Meigs, Judge, Franklin Circuit Court, Frankfort, pro se.

Larry Cleveland, Frankfort, for appellee.

LEIBSON, Justice.

The issue before us is under what circumstances did Sherman Wright, who was accused of murder and facing the death penalty, have the right to have the public and press excluded from voir dire proceedings.

Ernest Amburgey was found murdered in Franklin County on February 3, 1982. Sherman Wright, John Hurst, and Velda Amburgey, the wife of the victim, were indicted for the crime. Wright and Hurst were accused of being murderers hired by Mrs. Amburgey to kill her husband.

These events generated a great deal of news media coverage. It continued and intensified as the case progressed towards trial. There were news reports characterizing the events as a "brutal," "contract" murder. There were headlines such as "State Employee Brutally Beaten, Slain," "Wife Hired Pair in Killing, Police Say," and "Daughter May Testify at Mrs. Amburgey's Murder Trial."

Much of the material, if believed, would prejudice the reader. Some of the reports were factually inaccurate. The function of the news media is to publish information and not to prove it. If the reader was a prospective juror, he was presented with incriminating material which would never be introduced at trial.

One of the three accused, Hurst, entered a negotiated plea. The case against Sherman Wright and Mrs. Amburgey proceeded to trial, but Mrs. Amburgey withdrew her not guilty plea while the jury was being selected, pled guilty to the charge, and later testified as a witness against Wright.

Wright had made a pretrial motion for individual voir dire examination of prospective jurors and another motion for an order limiting news media coverage of the proceedings. As regards voir dire, the thrust

of his motion was that he wanted individual voir dire and wanted the news media excluded so that jurors would neither hear nor learn of the answers of other prospective jurors as those answers related to the extent of their previous knowledge about the case gleaned from the news media and as to their views regarding the death penalty. The pretrial discussion regarding news media coverage extended to other areas beyond individual voir dire of prospective jurors, but Wright was told he would be denied relief except in this limited area. No written order was entered.

The trial began September 15, 1982. After drawing names of approximately twenty-five potential jurors and seating these persons in and near the jury box, the trial judge retired to the jury room with counsel and the accused and commenced individual voir dire of prospective jurors out of the presence of the press and the public. When notified that the members of the news media objected to being excluded, he notified them of his decision to close this portion of the proceedings.

The next day he entered written "Findings of Fact, Conclusions of Law and Order" closing the individual voir dire proceedings "to the members of the public, press and media" and specifying "the remainder of the proceedings herein normally open to the public, press and media shall remain open."

The appellants, representatives of the press, immediately sought a writ of prohibition against the trial court to compel opening the voir dire procedure, which the Court of Appeals denied. The next day, September 17, 1982, this Court reversed the Court of Appeals and directed the trial court "to hold a hearing on the issue of whether the press and the public should be excluded from the voir dire." Further, we directed the trial judge "to stay all proceedings in the above-referenced proceedings until he enters appropriate findings relative to the hearing."

The trial court promptly convened a hearing before proceeding any further with the

trial. The appellants were then given an opportunity to present their arguments against closure. At one point during the hearing they stated they were "prepared" to put on as witnesses news reporters who would testify from their experience that the presence of the press at voir dire would not generate "complaints or problems." The offer to produce evidence was never pursued nor ruled upon. Their "evidence" (if such opinions can be so characterized) was not preserved because no avowal was made.

At the conclusion of the hearing the court stated it would "overrule all motions and reiterate and readopt all findings and conclusions of law made in the order of September 16 . . . (W)e'll continue with individual interrogation of prospective jurors in chambers absent public and press as we have done so far." The court further ruled that there would be "no restriction on the availability" of transcripts of the voir dire proceedings.

The appellants then filed a new motion for immediate relief before the Court of Appeals, but were unable to obtain a hearing before voir dire was completed. The Court of Appeals then sustained a Motion to Dismiss their action as "now moot." They appeal to this Court as a matter of right from the order of dismissal by the Court of Appeals.

▊ Before turning to the merits of this case, we must first decide whether it was proper for the Court of Appeals to dismiss the case as moot. We conclude that the controversy before us is not moot simply because voir dire (and now the trial) has been completed. This case falls squarely under the recent United States Supreme Court decision in *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), in which an order excluding the press from a criminal case was reviewed after the trial was concluded. The court quoted and followed its earlier decision in *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976):

> "The Court has recognized, however, that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.'" 427 U.S. at 546, 96 S.Ct. at 2796.

In *Globe* the Court states: "(B)ecause criminal trials are typically of 'short duration,' such an order will likely 'evade review.' We therefore conclude that the controversy before us is not moot within the meaning of Art. III, and turn to the merits."

There is little doubt that the controversy now before our Court falls within the standard, "capable of repetition, yet evading review." Unfortunately, the courts of this Commonwealth are faced with death penalty cases with alarming frequency. The problem of when to hold individual voir dire in such cases, together with the important questions this raises related to public access, and more particularly news media access, to criminal trials, will likewise be with us.

We come now to the merits of the controversy. The question is whether, when and how the public and press should be excluded when the accused, charged with a capital offense, so requests as a corollary to individual voir dire of prospective jurors.

The reason for considering the request for individual voir dire and for considering excluding the public and the press from such voir dire is the same. It is the right of the accused to "an impartial jury" guaranteed by the Sixth Amendment of the United States Constitution and Section 11 of the Kentucky Constitution. As expressed in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), it is the concept of a *neutral jury,* always important, but particularly so in qualifying a jury to consider the death penalty.

On the other hand the "right of access" of the public and the press to be in attendance during a criminal trial is also recognized as having constitutional status. In *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), among the most recent pronouncements on the subject, Chief Justice Burger traces the history of public trials starting

"in the days before the Norman conquest" and concludes that such "access" as a fundamental constitutional right derives from the expressions in the First Amendment of the United States Constitution related to freedom of speech, freedom of the press, and the right of peaceable assembly.

■ As has often been generalized, the basic dilemma is fair trial versus free press. In a well written opinion by Judge Anthony M. Wilhoit in *Ashland Publishing Co. v. Asbury,* Ky.App., 612 S.W.2d 749 (1980), the status of this conflict under the United States and Kentucky Constitutions is carefully assessed and judiciously evaluated. It would be difficult to improve on Judge Wilhoit's opinion, so we use it as a point of departure.[1]

This quote by Judge Wilhoit from Judge Learned Hand sets the tone for what follows:

> "Just as modern notions of what is embodied in the constitutional safeguard of a free press are much broader than what once was thought to suffice, so too have notions of what is embodied in the safeguard of a fair trial expanded. Still, these two safeguards collide only when an extremist view is taken of either. Such views are foreign to the spirit of both the federal and state Bills of Rights and their 'admonitions of moderation.' L. Hand, A Plea for the Open Mind and Free Discussion, in *The Spirit of Liberty,* 274, 278 (2d ed., enl. I. Dillard 1953)." 612 S.W.2d at 752.

Much of the argument in the present case presupposes that a distinction exists between public and press right of access to pretrial proceedings and the trial itself. Counsel has debated whether picking the jury should be considered as a preliminary procedure or part of the trial. As Judge Wilhoit states:

> "The same policy which calls for openness in criminal trials also calls for openness in pretrial proceedings. Nevertheless, the

right of the public and press to be present at criminal proceedings, even trials, is not absolute." 612 S.W.2d at 752.

■ We agree. The closure question turns on a balancing of constitutional rights, those of the accused and those of the press and public, not on deciding the moment when the trial commences. When thus considered, whether the trial should be considered as having commenced in a technical sense when the jury is being selected or when the jury is sworn to try the case, becomes a distinction without a difference.

In *Lexington Herald Leader Co., Inc., v. Tackett,* Ky., 601 S.W.2d 905 (1980), we stated that "representatives of the news media enjoy the same right of access to public information as is available to any other member of the public, but that this right does not exceed the right of any other member of the public." This decision is squarely in line with the most recent decisions of the United States Supreme Court in *Globe Newspaper Co. v. Superior Court, supra, Richmond Newspapers, Inc. v. Virginia, supra,* and *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

■ The essence of the decisions in these three recent pronouncements of the United States Supreme Court is as follows: The Sixth Amendment guarantee of public trial is a right personal to the accused, but the First Amendment gives the press and public a right of access to trial separate and apart from the accused's Sixth Amendment right. It is only when necessary for protection of a defendant's Sixth Amendment fair trial rights that a court may, after a proper hearing, bar members of the press and public. The right of press and public access is not absolute, but the accused has no exclusive right to either demand or deny the presence of the press and public.

■ Applying those standards to this case we find no reversible error in the deci-

---

1. Judge Wilhoit's opinion is used with one reservation: The guarantee in the Ky. Const., § 11, of "a speedy public trial," like the guarantee of a "public trial" in the Sixth Amend-

ment of the U.S. Const., is a right *personal* to the accused, not part of public access to criminal trials. *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

sion of the trial court, after holding a hearing as directed by this Court, to conduct individual voir dire of prospective jurors in a proceeding closed to the public and to the news media. To the extent necessary to decide the questions before us, we will discuss principles and procedures appropriate to the fair trial/free press dilemma.

Because of the nature of this case and extensive pretrial publicity, a special venire of seventy persons was selected. It took four days to complete the voir dire, during which forty-nine potential jurors were questioned. Of these forty-nine, eighteen were excused because they indicated they could not vote for the death penalty under any circumstances or because they had formed an opinion which they could not put aside from news media reports. Twenty-nine of the remaining thirty-one prospective jurors had either heard, read or seen news media reports regarding the case, but did not answer questions so as to be disqualified by their answers. The uninhibited manner in which jurors responded to questions about their knowledge of the case does much to vindicate the trial court's decision to question the jurors individually and to exclude the public and the press during the questioning procedure. There is every indication that the procedure used resulted in the kind of full disclosure desirable to select an impartial jury.

■ What are the rules regarding closure?

(1) There must be a hearing. As stated in *Ashland Publishing Co. v. Asbury, supra,* "(B)efore ordering closure ... the trial judge should consider the utility of other reasonable methods available to protect the rights of the accused short of closure," and "... any member of the public or press who is then present and objects (at the time the motion for closure is made or heard) must be given an opportunity to be heard on the question. If closure is ordered, specific findings should be made setting out the need for closure." 612 S.W.2d at 753. As Chief Justice Burger stated in *Richmond*

*Newspapers, supra,* at 448 U.S. 581, at 100 S.Ct. 2829. "Absent an overriding interest *articulated in findings,* the trial of a criminal case must be open to the public."

(2) At the hearing to decide the question of closure, the accused who seeks closure has the burden of persuasion. The burden of proof is on those who would infringe the First Amendment right of access, not on those who assert it. See *Nebraska Press Assn. v. Stuart, supra,* at 427 U.S. 558–59, 569–70, at 96 S.Ct. 2807–08. However, whether this means that the accused is required to present any evidence, and if so what evidence, depends on the circumstances of the particular case. A distinction must be made as to whether a given proceeding historially has been opened or closed.[2] Individual voir dire of prospective jurors out of the hearing of their fellow jurors, when appropriate, is only appropriate because of the same type of considerations that apply to the traditional bench conference. If the scope of the right of access is partly defined by the history of openness of criminal procedures (*Richmond Newspapers, Inc. v. Virginia, supra,* at 448 U.S. 581 at 100 S.Ct. 2829), then its historical limits as regards openness also have to be considered as part of its definition. In the case of traditional bench conferences or historically accepted use of in-camera proceedings, the presumption with respect to such proceedings, or parts of proceedings, which have been traditionally closed, is that the denial of public access is legitimate. See *United States v. Gurney,* 558 F.2d 1202, 1210 (5th Cir.1977), cert. denied, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); cf. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). In such cases the burden of proof has not shifted to the press or public and the preliminary findings that must first be made have not been dispelled. But in such instances the public or press opposing the closure must show particular public policy reasons for access strong enough to overcome the tradition of closure.

2. When we analyze the cases, it is in this respect, and this respect alone, that the differ-
ence between a pretrial suppression hearing and trial-in-chief becomes significant.

(3) The burden of proof on the accused when he would infringe the public and press right of access is threefold: (a) He must show that the right or interest he wishes to protect is sufficiently important to warrant the extraordinary protection of the closed court. The right to a neutral jury qualifies as such a right or interest. (b) He must show that the asserted right or interest probably cannot be adequately protected by less restrictive alternatives to closure. See *Gannett Co. v. DePasquale, supra,* at 443 U.S. 441–42, at 99 S.Ct. 2936–37; *Nebraska Press Assn. v. Stuart, supra,* at 427 U.S. 563, at 96 S.Ct. 2804 (1976); and *Sheppard v. Maxwell,* 384 U.S. 333, 357–58, 86 S.Ct. 1507, 1519–20, 16 L.Ed.2d 600 (1966). (c) He must show that it is probable that the right or interest he seeks to protect, in this case his right to an impartial jury, will be protected by a closed proceeding. *Nebraska Press Assn., supra,* at 427 U.S. 565, 569, at 96 S.Ct. 2805, 2807 (1976).

It is never certain that an open court will ultimately result in an unfair trial. As stated by Justice Brennan in *Nebraska Press Assn., supra,* at 427 U.S. 599, at 96 S.Ct. 2822, "the harm to a fair trial . . . must inherently remain speculative." But the reason some matters have been heard traditionally in open court while for others a bench conference or in-chambers procedure has traditionally seemed appropriate, has been in whole or in part, to afford a fair trial. It follows that the historical practice has weight in the hearing to consider the closure question.

Against this background we must consider the particular case at issue. There is no United States Supreme Court decision, nor any Kentucky case, dealing specifically with limited closure during individual voir dire of prospective jurors. The appellants rely principally on *United States v. Brooklier,* 685 F.2d 1162 (9th Cir.1982) and *United States ex rel. Pulitzer Publishing Co.,* 635 F.2d 676 (8th Cir.1980). As decisions of the United States Court of Appeals, rather than the Supreme Court, neither is controlling authority. Neither case holds that a closed voir dire procedure is necessarily inappropriate. Both hold the procedure before clo-

sure was inadequate under the facts particular to the case.

The *Pulitzer Publishing Co.* case, *supra,* is distinguishable on its facts. The District Court was reversed because the trial judge failed to "inquire or attempt to find an alternate solution" to closure and "most importantly, the trial judge made no findings on the record to support closure." 635 F.2d at 677.

In *Brooklier, supra,* the 9th Circuit Court of Appeals reversed the District Court for ordering voir dire closed. After acknowledging that the United States Supreme Court had not yet "settled" the question, the 9th Circuit adopted a more restrictive interpretation of the pronouncements of the United States Supreme Court than we deem necessary or appropriate. The Court states:

> "Since the purpose of the findings is to enable the appellate court to determine whether the closure order was properly entered, the findings must be sufficiently specific to show that the three substantive prerequisites to closure have been satisfied—that there is a substantial probability (1) that public proceedings would result in irreparable damage to defendant's right to a fair trial, (2) that no alternative to closure would adequately protect his right, and (3) that closure would effectively protect it. The court's findings did not meet this test." 685 F.2d at 1168–69.

■ The difficulty is not with these standards, but with their application. These standards should be treated as general principles, not as the basis for setting up a technical procedure that the trial court must follow in deciding the question of closure. We elect not to write formal procedures for notice and conduct of the hearing regarding closure. We believe such technicalities would obstruct the trial court's exercise of its judicial function. The closure question arises in an infinite variety of circumstances. When and what advance notice must be given to the public and press, whether the taking of evidence is

appropriate for the decision making process, what alternatives to closure are available and who should suggest them, will vary from case to case. As long as the trial court adheres to the general principles in the decisions of the United States Supreme Court and of this Court we refuse to arrange a series of hoops for the trial court to jump through on the way to its decision.

■ To return to the previous quote from Justice Brennan, the nature of the decision is "inherently speculative." Therefore, a proper standard of review is to recognize that the decision is an exercise of a discretionary function by the trial court, that this Court should not impose a rigid format for the exercise or expression of that discretion, and that this Court should respect the decision of the trial court unless it appears from the record that he has abused his discretion.

The Supreme Court of California, in *Hovey v. Superior Court of Alameda County,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980) followed a different course. It elected to lay out a formal procedure "that in future capital cases that portion of the voir dire of each prospective juror which deals with issues which involve death-qualifying the jury should be done individually and in sequestration."

The virtue of the *Hovey* case is that it recognizes the right of the accused facing the death penalty to individual voir dire of prospective jurors in a closed procedure, which was the right decision for the facts of the case then before the court. The problem with the *Hovey* case is that it sets up a mandatory procedure for all cases while "death-qualifying the jury." As such it has the same vice as the mandatory closure procedures struck down in *Globe Newspaper Co. v. Superior Court, supra,* and *Lexington Herald Leader Co. v. Tackett, supra.* It establishes a general rule for all cases without regard to the circumstances of the particular case, which may or may not justify closure.

■ The correct rule permits or denies closure on facts particular to the case after considering whether there is a reasonable alternative sufficient to adequately protect the accused's right to a fair trial before an impartial jury. Each case will differ depending upon the circumstances.

Neither the legislature nor this Court can carve out a situation where closure would be proper under any circumstances. However, on the other hand, it is equally inappropriate for this Court to develop a set of rules and procedures that the trial court must follow in applying the general principles which we have outlined. Whether the hearing should be evidentiary and who must present the evidence, whether there are reasonable alternatives to closure available sufficient to accomplish the same result, all address themselves to the sound discretion of the trial court.

Nor is it appropriate for an appellate court to review the exercise of that discretion with a check list in hand, searching for technical error. The only question before this Court is whether, viewed as a whole, and considering the principles involved, the trial court gave adequate consideration to both the First Amendment rights of the press and the public and the Sixth Amendment rights of the accused.

The United States Supreme Court has granted writ of certiorari in *Hovey (Press-Enterprise Co. v. Superior Court),* —— U.S. ——, 103 S.Ct. 813, 74 L.Ed.2d 1012 (1983). Regardless of the outcome, *Hovey* has value for our purposes because of its lengthy analysis (55 pages) of evidence regarding psychological and sociological studies of the effect on jurors of exposure to both news media coverage and the answers of their co-jurors. We need not go so far as the California court, and hold that it is necessary in every case for the judge to voir dire jurors individually, out of the hearing of both fellow jurors and the news media, before an impartial jury can be selected in a death case. We need only decide whether the trial court properly exercised its discretion in making that decision in the present case.

■ We decide as follows:

1) It would be unreasonable in the circumstances as they developed in this case to

expect or require that the trial court set a hearing in advance and invite the news media before taking action. Individual voir dire of prospective jurors on their views of the death penalty and their previous knowledge of the case, held out of the hearing of their fellow jurors, the public and press, is a *traditional* procedure, used in the trial court's discretion. The trial court was not required to anticipate objection and give advance notice to the press. Such a requirement might lead ultimately to requiring such a step in every case before a bench conference or in-chambers procedure. In the circumstances of this case notice and an opportunity to be heard means only notice to those present when the voir dire commenced and an opportunity to be heard when objection to closure was made.

2) When the news media objected to closure, the trial court was required to hold a hearing and, before ordering closure, establish "an overriding interest articulated in findings." *Richmond Newspapers, Inc. v. Virginia, supra.* Initially, while it articulated findings, the trial court failed to follow the necessary hearing procedure. *Gannett Co. v. DePasquale, supra, Richmond Newspapers, Inc. v. Virginia, supra,* and *Ashland Publishing Co. v. Asbury, supra.* This defect was promptly addressed by this Court and corrected by the trial court.

The trial court stopped voir dire when it received our order and held a hearing before proceeding further. The record of that hearing is adequate to support the trial court's previous decision to hold individual voir dire in a closed proceeding. At one point the appellants offered to produce evidence at the hearing. This offer was not refused and the appellants did not pursue it.

Certainly it was not inappropriate for a trial judge of 22 years experience to state that experience on the record and to take it into account in reaching his decision in a matter of this type.

The record does not show that the trial court refused to consider viable alternatives to closure. On the contrary none were suggested.[3]

Voir dire is a part of the trial with problems unique in balancing fair trial/free press problems. The methods for alternative solutions present at other stages do not exist. Change of venue, which is an available alternative if pretrial publicity makes it necessary, is no longer available.

Controls over the jury that exist after the jury is selected are not yet available. With a panel of seventy, sequestering prospective jurors is not an available alternative. There is no jury at this stage, just prospective jurors—a venire that may not yet be fully drawn. More will be drawn if the panel is exhausted and they can hardly be admonished to prevent exposure to the news media. Questioning the jurors after the fact as to what they have read is an unsatisfactory substitute.

In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court discussed the problems related to "the psychological impact" of the answers of fellow jurors. The trial court exercised sound discretion in refusing to voir dire jurors individually with respect to their knowledge of the facts, or what they believe to be the facts after news media reports, before their fellow jurors. The same can be said with reference to answers regarding their views on the death penalty.

**3.** The only case that we have found suggesting an alternative to closing voir dire where individual examination of jurors appears necessary is *United States v. Layton,* 519 F.Supp. 959 (N.D.Cal.1981). There the court closed voir dire, but permitted three representatives of the news media to be present. It then provided, at p. 960:

"The potential jurors will be assigned numbers by the clerk of the court. During the *voir dire* examination, and at all other proceedings in this case, they will be referred to by the court and by counsel for each side only by those numbers."

This was followed by a "gag" order to counsel and court personnel preventing them from revealing the names of the potential jurors.

In the present case we do not know whether the news media would have considered itself properly accommodated by the procedure followed in *Layton.* No such alternative was suggested.

It makes no sense to attempt to prevent other jurors from hearing such prejudicial answers in the courtroom if at the same time the news media will be free to disseminate them.

*The American Bar Association Standards for Criminal Justice,* Sec. 2.12(b), "Procedure in Empaneling the Jury," provides in pertinent part:

"Where there is reason to believe the prospective jurors have been previously exposed to information about the case, or for other reason are likely to have preconceptions concerning it, counsel should be given liberal opportunity to question jurors individually about the existance and extent of their preconceptions."

If we intend to pay more than mere lip service to the concept of an impartial jury, we must give the trial court discretion to prevent other jurors from being exposed to their answers.

Considered as a whole, and subject to one correction, the hearing which we ordered and which the trial court then carried out, the record does not support the position of the appellants that their first amendment right of access was denied in this case in a manner constitutionally impermissible. The Court of Appeals erred in dismissing this case on motion as moot, but such error does not affect the result. Therefore, on other grounds as stated herein, the Court of Appeals' order dismissing the within actions is affirmed.

AKER, GANT, LEIBSON, STEPHENSON and VANCE, JJ., concur.

WINTERSHEIMER, J., files a dissent, in which STEPHENS, C.J., joins.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because the public and the press have a right to be present during the voir dire examination of a jury in a criminal trial. It must be understood that this right is not absolute but is conditioned by their good behavior and the overriding concern that the right of the accused to a fair trial will be scrupulously protected. *See Ash-*

*land Publishing Co. v. Asbury,* Ky., 612 S.W.2d 749 (1980).

The voir dire examination in a criminal trial is an integral part of the proceeding to which the public has a right of access under the first amendment. Although it is actually before the evidentiary part of the trial, the jury examination is generally considered to be part of the trial itself. *United States v. Brooklier,* 685 F.2d 1162 (9th Cir., 1982).

The public's right to know about criminal prosecutions has long been recognized. *Johnson v. Simpson,* Ky., 433 S.W.2d 644 (1968); *Lexington Herald-Leader Co., Inc. v. Tackett,* Ky., 601 S.W.2d 905 (1980).

Public trials are highly favored. Courtroom doors may be closed to the general public only on rare occasion after determination that there is no other way that justice can be properly served. Courtrooms are kept open not so that the public may be exposed to wrongdoing and the commercial exploitation of curiosity, but rather they are open to allow all the citizens to see for themselves how the laws are applied. Trial judges should not close the courtrooms to the press when any members of the public are to be admitted. *Tackett, supra.*

It is a crucial part of the democratic system that the public and the press should know what goes on in their courts. Consequently, the voir dire examination as part of a criminal proceeding must be open.

It has always been the principal concern of the Kentucky courts to protect the constitutional rights of the accused. Exclusion of the press and public is proper only where there is a factual showing and the trial judge reasonably believes that the dissemination of information would irreparably damage the rights of the accused.

In this case, there is no evidence that the closing of the jury examination proceedings would be effective in encouraging the prospective jurors to respond truthfully. The trial judge should have made a detailed factual showing of the probable harm to the accused's fair-trial rights. General statements by the trial judge as to the necessity

of balancing the First and Sixth Amendment rights are not sufficient unless they are clearly supported by the record.

The public policy considerations previously expressed by this Court in *Tackett, supra,* and *Johnson, supra,* apply to a criminal trial in the voir dire examination of the jury. The public is a party to all criminal proceedings, including that part of the action in which a jury is selected. Jury examination must be kept open to allow the citizens at large an opportunity to see if the jury was impartially selected. The right of the public and the press to be present in open court at all times has been well settled, not only in this Commonwealth, but in the nation as a whole.

It must be clearly understood that with each right comes a corresponding responsibility. It is the responsibility of the public and the press to behave in a proper manner when exercising this valuable right. It is the difficult duty of the trial judge to enforce the delicate balance which must be maintained between a fair trial and a free press.

STEPHENS, C.J., joins in this dissent.