Jason RILEY; and The Courier–Journal, Inc., Appellants,

v.

Honorable Susan Schultz GIBSON, Judge, Jefferson Circuit Court, Appellee.

and

Commonwealth of Kentucky; and Don Sinclair Fielder, Real Parties in Interest.

No. 2010–SC–000619–MR.

Supreme Court of Kentucky.

May 19, 2011.

Jon. L. Fleischaker, Jeremy Stuart Rogers, Caroline Lynch Pieroni, Dinsmore & Shohl, LLP, Louisville, KY, for appellants.

Hon. Susan Schultz Gibson, Judge, Jefferson Circuit Court, Louisville, KY, for appellee.

Erin Clark White, Assistant Commonwealth Attorney, Office of the Commonwealth's Attorney, Louisville, KY, for Commonwealth of Kentucky, Real Party in Interest.

Amy Irene Hannah, Louisville, KY, for Don Sinclair Fielder, Real Party in Interest.

Opinion of the Court by Justice
NOBLE.

Appellants, Jason Riley and the Courier–Journal, Inc., appeal the Court of Appeals' denial of a writ of mandamus or prohibition requiring media access to a juror contempt hearing. Because a right of access does extend to criminal contempt hearings, the Court of Appeals is reversed.

## I. Background

This case arises out of a hearing held by Jefferson Circuit Court Judge Susan Schultz Gibson to address a juror's alleged disobedience of the court's admonition to avoid publicity about the case. Immediately after the verdict had been issued, two jurors alleged that a third juror had disobeyed the court's admonition by seeking out television coverage online. The Commonwealth moved for a mistrial based on these allegations. Instead, the judge questioned the third juror about the accusation in open court, and that juror denied any wrongdoing. No other evidence was presented. The judge then ruled that any alleged juror misconduct did not impact the verdict, and denied the Commonwealth's motion for a mistrial.

The trial court subsequently issued subpoenas for the three jurors, two accusers and one accused, to appear on May 10, 2010 for a "contempt of court" hearing. When they arrived, the judge took the jurors into chambers and asked each to state his position. The accused juror was not represented by counsel, and was not allowed to cross-examine the two accusers. Excluded from this hearing were the Commonwealth's Attorney and Appellant Riley, a reporter from the Courier–Journal, both of whom objected to their exclusion.

Following the hearing, the trial court determined that there was insufficient evidence to find the accused juror to be in contempt of court, and again allowed the verdict to stand. At this point, Appellants restated in writing their objection to the closure of the hearing and moved for immediate release of a recording of the hearing. The court granted this motion and the recording of the hearing was released.

Dissatisfied by this result, Appellants filed a petition for a writ of mandamus or prohibition against Judge Gibson's closure of the hearing. The Court of Appeals denied the writ for mootness. That ruling is on appeal to this Court as a matter of right. CR 76.36(7).

## II. Analysis

Before addressing the merits of the writ, this Court must address whether the case

is moot, and if so, what effect that has on the availability of a writ.

## A. Mootness

■ This case is unquestionably moot. The contempt hearing that the media sought access to is over. No one is requesting that the trial court now redo the contempt hearing to allow media access. Indeed, as evidence of mootness, no one has filed a response to Appellants' request for the writ. Appellants themselves do not desire relief particular to this case but believe a writ will serve to bar exclusion of the media in *future* contempt proceedings. In other words, while Appellants admit mootness, they believe this matter must be resolved now, in an advisory manner, because it is capable of repetition, yet evading review.

■ "Capable of repetition, yet evading review" is a well-recognized exception to the mootness doctrine, although one to be used sparingly. Because claims for live media access, such as this one, inherently seek relief from situations that abruptly and completely expire after a hearing is complete, they tend to fall into this category of being capable of repetition, yet evading review. For example, in *Lexington Herald–Leader Co. v. Meigs*, 660 S.W.2d 658, 660 (Ky.1983), members of the press had unsuccessfully objected to their exclusion from voir dire proceedings. The press sought immediate relief in the Court of Appeals, and this Court remanded and ordered the trial court to conduct a hearing on the propriety of closing the proceedings. Reaching the same conclusion about conducting individual voir dire, the court again denied access to the media, who again filed a writ petition. But by the time they were able to obtain a hearing, voir dire had been completed. *Id.* at 661. The Court of Appeals, therefore, dismissed the petition as moot. *See id.* Finding the

problem of media exclusion from voir dire capable of repetition, yet evading review, this Court found the dismissal for mootness to be error. *Id.* The Court quoted the United States Supreme Court's determination that "because criminal trials are typically of 'short duration,' such an order will likely 'evade review.'" *Id.* (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)). Because a live case or controversy on these facts would likely continue to evade the Court's adjudication in the future, the Court issued an opinion. *See id.* Ultimately, though the media exclusion was initially erroneous, this Court concluded that the error was cured by the trial court's hearing, and affirmed the exclusion based on the trial court's reasons for the exclusion.

This case is equally capable of repetition, yet evading review. Private contempt hearings carry the same inherent immediacy and expiration as private voir dire. Thus, this Court concludes that this case fits within the limited exception to mootness for cases that are technically moot but are capable of repetition while evading review. Consequently, after exercising caution in approaching a moot case, it is appropriate to consider the writ petition itself.

## B. Appropriateness of Writ

■ A writ of prohibition or mandamus is an extraordinary form of relief and should not freely be granted. The two situations where a writ may normally be appropriate are

(1) [where] the lower court is proceeding or is about to proceed outside of its jurisdiction and there is no remedy through an application to an intermediate court; or (2) [where] the lower court is acting or is about to act erroneously, although within its jurisdiction, and

there exists no adequate remedy by appeal or otherwise and great injustice and irreparable injury will result if the petition is not granted.

*Hoskins v. Maricle,* 150 S.W.3d 1, 10 (Ky. 2004).

We need not analyze whether either of these circumstances arise here, however, for this Court has recognized *sui generis* availability of writs by the media seeking trial access. *Central Kentucky News–Journal v. George,* 306 S.W.3d 41, 44 (Ky.2010). "In short, 'to preserve higher values,' the news media have been made an exception to the usual rules regarding standing to intervene and standing to seek mandamus where access is denied." *Courier–Journal and Louisville Times Co. v. Peers,* 747 S.W.2d 125, 128 (Ky.1988). "Such must be the case . . . because '[t]he First Amendment guarantee of freedom of the press and the Sixth Amendment guarantee of public trial in criminal cases, as presently interpreted and applied in judicial decisions, have placed the news media in a unique position in demanding access to court proceedings. . . .' " *George,* 306 S.W.3d at 44 (quoting *Peers,* 747 S.W.2d at 127–28).

Although this precedent has treated the media as excepted from the standard requirements for a writ, its analysis could equally be used to explain why such petitions by the media are likely to satisfy the requirements of the second type of writ described in *Hoskins v. Maricle.* Such a writ has two criteria for availability: there exists no adequate remedy by appeal or otherwise; and great injustice and irreparable injury would result if the petition is not granted. Since the media seeking access to court proceedings is never itself party to those proceedings, it has no alternate remedy aside from a writ petition. Because the injury the media claims in such actions is potentially an abridgement of its First Amendment right to access information, great injustice and irreparable injury would indeed result if a meritorious petition were to be denied. Thus, due to the media's unique third-party interest in cases such as this, a writ is potentially an appropriate remedy.

## C. Right of Access

Turning to the merits of the writ petition, we must first note that the United States Supreme Court held in *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), that a person charged with contempt, that is, the contempt *defendant,* is entitled to "be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf. . . ." *Id.* at 508–509. Further, "[i]t is the 'law of the land' that no man's life, liberty or property be forfeited as a punishment until there has been a charge fairly made and fairly tried *in a public tribunal.*" *Id.* at 510 (emphasis added). But this right belongs to the contempt defendant, not the media. The question, then, is whether the media enjoys a separate right of access to contempt hearings.

Appellants' request for access to contempt hearings is grounded in the freedom of the press provided by the First Amendment. Of course, no explicit "right of access" can be found in the First Amendment, or anywhere else in the Constitution. Neither Freedom of Speech nor of the Press directly provides such a right. Those First Amendment provisions, on their face, concern the freedom to express information and ideas, not the right to gather information and ideas; in other words, they protect output, not input. However, the United States Supreme Court has declared that these freedoms of

expression may sometimes imply a constitutional right of access. "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Thus, the Court has allowed this implicit right where access to certain proceedings, or documents, is essential for bedrock First Amendment expression to be exercised.

■ The question presented here is whether the hearing in this case is such a proceeding to require media access. Appellants claim that the U.S. Supreme Court has recognized the extension of this freedom to criminal contempt proceedings. They state that in *Richmond Newspapers v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), "the U.S. Supreme Court recognized that the First Amendment right of access applies not only to criminal trials but also to contempt hearings." This Court is bound by the United States Supreme Court's decisions on all matters of federal law, including, obviously, the First Amendment. Thus, a Supreme Court opinion applying the right of access to contempt hearings would bind this Court's resolution of this case.

The only mention of contempt hearings in *Richmond Newspapers* is indirect and appears in its discussion of *Levine v. United States,* 362 U.S. 610, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960). The Court noted that *Levine* had held that even criminal contempt hearings, while not within the Sixth Amendment realm of "criminal prosecutions," still must meet the due process requirement of the Fourteenth Amendment. *Richmond Newspapers,* 448 U.S. at 574–75, 100 S.Ct. 2814 (citing *Levine,* 362 U.S. at 616, 80 S.Ct. 1038). Though it did not decide the exact question of media access to contempt proceedings, *Richmond Newspapers* went on to hold that the long history and logic of allowing public access

to criminal trials demonstrated the existence of the right implicitly in the First Amendment. This analysis established what has become known as the two-tiered history-and-logic test. "These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes. If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches." *Press–Enterprise v. Superior Court II,* 478 U.S. 1, 9, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986).

■ In cases where the Supreme Court has extended a right of access to certain proceedings, it has emphasized that public access to such proceedings serves an integral public purpose. Importantly, protecting the defendant himself does not provide sufficient logical grounds for extending this right, as that interest is vindicated instead by the Sixth Amendment and the Due Process Clause. *Levine,* 362 U.S. at 616, 80 S.Ct. 1038. A First Amendment right of access is only needed to supplement the rights of a defendant where the public itself is invested in the proceeding.

The Supreme Court has stated that "[t]he value [to the public] of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press–Enterprise v. Superior Court I,* 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). But why does the public itself care what occurs during such criminal trials? The Court explained,

This openness has what is sometimes described as a 'community therapeutic value.' Criminal acts, especially violent crimes, often provoke public concern,

even outrage and hostility; this in turn generates a community urge to retaliate and desire to have justice done. Whether this is viewed as retribution or otherwise is irrelevant. When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions. Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected.

*Id.* at 508–09, 104 S.Ct. 819.

■ This community therapy is provided by public access to most, if not all, stages of standard criminal prosecutions. *See Richmond Newspapers*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (criminal trials); *Press–Enterprise I*, 464 U.S. 501, 104 S.Ct. 819 (some preliminary hearings); *Press–Enterprise II*, 478 U.S. 1, 106 S.Ct. 2735 (voir dire). Thus, if it can be established that all defendants, or the public at large, have a stake in the process and outcome of such proceedings, then public access must be allowed. Clearly, this would include public access to criminal contempt proceedings, which are analogous to criminal trials in general, given that the purpose of criminal contempt proceedings is to impose punishment. The public's interest in access is to make sure that the court's contempt power is not being abused, either to the unfair benefit or detriment of those accused of acting contemptuously. This interest is sufficient to require access under the First Amendment.

The question, then, is whether the hearing in this case was actually a contempt hearing. Interestingly, the trial court in this case held *two* hearings regarding the alleged contempt. The first hearing was held immediately after the verdict came in, when two jurors approached the court to complain about the acts of a third. The accused juror was questioned at length on the record, and denied the accusations. In her ruling after the juror testimony, the trial judge did not address the alleged contempt directly, but instead held that even if the juror had done as charged, it had no effect on the verdict. This ruling essentially found the alleged behavior to be harmless.

However, on reflection, the trial court decided to make an additional record regarding the conduct, and subpoenaed all three jurors to appear on May 10, 2010 for a contempt hearing. Over objection from the Courier–Journal and the Commonwealth, they were taken to the judge's chambers rather than being heard in open court. The hearing was recorded, and the judge explained that because of the allegations made after the trial, she was making a record, and all she wanted to hear was "a bare statement" by each juror of what they heard or said. All three jurors made their statement, and then the trial court commented that she was required to "follow up" on good faith allegations by confronting the person accused and making a record. She further explained that "in order to hold anybody in contempt, I need to find by clear and convincing evidence that the contempt occurred." In conclusion, she expressed a need to "be very cautious about ever holding a juror in contempt, because it's such an incredible chilling effect on the jury system," and stated that she did not find that there was clear and convincing evidence of a willful violation of her juror conduct order. She further concluded that she had brought the jurors in because this issue had caused "80

or 90 man hours" of delay. She then told the jurors they were free to go.

The trial court then informed the prosecutor and the Courier–Journal that she had decided not to hold anyone in contempt, and that she would give them a recording of the hearing. The Courier–Journal followed this with a written objection to being excluded, and a request for immediate possession of the recording, which the court granted. The transcript of the contempt hearing demonstrates the problem the trial court Was having in protecting the sanctity of the jury process and addressing a possible contempt of court.

Courts have long protected the historic privacy of jury deliberations. This historic privacy generates much value to the sanctity of trials. As Justice Cardozo articulated, "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Clark v. United States,* 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933). More recently, Justice Blackmun explained that "[t]he State has a similar interest in protecting juror privacy, even after the trial—to encourage juror honesty in the future...." *Press–Enterprise I,* 464 U.S. at 515, 104 S.Ct. 819 (Blackmun, J., concurring). In dealing with jurors, this is an administrative duty of the court which must be balanced with actual misconduct by a juror.

 There is continuing confusion about the process and parameters of an action for contempt. Unfortunately, many courts exercise this inherent power to protect the sanctity of the courts without regard for the type of contempt alleged and the type of penalty to be given to one held in contempt. A contempt is "willful disobedience toward, or open disrespect for, rules or orders of court." *Commonwealth v. Burge,* 947 S.W.2d 805 (Ky.1996). A

contempt occurring in the presence of the court is *direct contempt,* while a contempt committed outside the presence of the court is *indirect contempt. Id.* at 808. A contempt may be *civil,* which requires performance of a court order, or *criminal,* which allows punishment rather than obedience. *Id.* The latter requires a hearing and presentation of evidence, and must comport with due process, including the right to counsel and public access. *Commonwealth v. Pace,* 15 S.W.3d 393 (Ky. App.2000); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). If a court intends to punish a defendant for contempt with a serious fine for a single contempt, or confinement in excess of six months, there must be a trial by jury. *Codispoti v. Pennsylvania,* 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974). *Jurors* may be punished for criminal contempt for disobeying the orders of the court. KRS 432.230.

Clearly, the trial court here was trying to balance respectful treatment of a juror with a possibility that she may have to punish a juror for misconduct. During a juror's term of service, the trial court has the additional duty of jury management, ensuring that jurors are available and present for trial, that they are properly instructed on their conduct, and following up on indications that they might have violated that conduct requirement. In doing this, the trial court has any number of communications with some or all of the jury venire outside the confines of any specific trial.

From the scant record before us, it appears that the trial court may have been prepared to issue a contempt ruling and punishment if her further inquiries convinced her that the accused juror had committed the contempt. However, the "hearing" was not an appropriate contempt hearing, lacking the requisite due process.

The juror was not represented by counsel; the juror was not allowed to cross-examine his accusers, and there was no public access. By questioning the jurors in her chambers, the trial court recognized the importance of protecting jury deliberations, even after trial, and referenced the fact that she had no wish to cause a "chilling effect" on future jurors. What she was really doing was examining jurors about their respect for the importance of the court's orders, and whether one juror in particular had disobeyed her orders. Thus, despite the judge's apparent willingness to hold the juror in contempt, this hearing could be viewed more as a preliminary investigation as part of the court's power to manage the jury, rather than a true contempt hearing. From such a preliminary inquiry, the trial court could have decided to hold a full contempt hearing by issuing a rule or show cause order, followed by a public hearing at which the accused was represented by counsel, had the right to testify, present witnesses, and question all witnesses, and which was tried to a jury if more than six month's confinement or a serious fine was an option.

Nonetheless, as far as the media was concerned, this hearing was labeled a criminal contempt proceeding, and as such, the media was entitled to be present, as was the public at large. If the court had intended simple jury management, practice would have allowed an initial inquiry to the jurors, which would not have required placement on a docket or making a record. Such a limited inquiry should be kept separate from an actual, formal contempt proceeding. Although conducted improperly, due to the time spent on the issue and the desire to make a record, we conclude that the trial court intended a contempt hearing in this instance.

Because the public's interest in a criminal contempt proceeding is essentially the same as its interest in any criminal trial, criminal contempt proceedings must be open to the public, including the media. Although it is arguable here that after the first hearing the court was more interested in making a record to support her trial ruling denying a mistrial, the second proceeding, labeled a contempt hearing, must be taken at face value and regarded as such for purposes of public access. It is not sufficient to hold the hearing first, and then determine what it is. The media and the public have the right to rely on what the docket says in pursuing their right to access.

## III. Conclusion

For the aforementioned reasons, the Court of Appeals' denial of a writ of mandamus or prohibition on grounds of mootness is reversed. An exception to the mootness doctrine allows the media to pursue a writ when a case is capable of repetition but evades review. Additionally, The Courier–Journal and Mr. Riley are entitled to a writ stating that criminal contempt hearings are to be afforded public access. Public access is not required, however, for the court's jury management functions, which are to be kept separate from contempt proceedings.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, and VENTERS, JJ., concur. SCHRODER, J., concurs in result only by separate opinion in which SCOTT, J., joins.

SCHRODER, J., concurring in result only:

The majority struggles too much to uphold the right of access in this case. In my view, the case is a simple one. The right of the public and press to attend criminal trials is implicit in the guarantees of the First Amendment. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S.

555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The proceeding at issue was to consider punishing a juror for disobeying the trial court's admonition in a prior trial. This is a criminal contempt trial. It is subject to the press and public's right of access. *Id.* Case closed.

SCOTT, J., joins.