**Ronny D. WALKER, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

No. 2010–SC–000409–MR.

Supreme Court of Kentucky.

Sept. 22, 2011.

James David Niehaus, Deputy Appellate Defender, Annie O'Connell, Assistant Appellate Defender, Office of the Louisville Metro Public Defender, Louisville, KY, for appellant.

Jack Conway, Attorney General, Jason Bradley Moore, Assistant Attorney Gener-

al, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, for appellee.

Opinion of the Court by Justice ABRAMSON.

Ronny Walker appeals as a matter of right from a Judgment of the Jefferson Circuit Court convicting him of murder, first-degree burglary, tampering with physical evidence, intimidating a participant in the legal process, and tampering with a witness. For the murder, Walker was sentenced to life in prison without the possibility of parole for twenty-five years. Walker was also found to be a first-degree persistent felon and as such was sentenced for the other offenses to a total of fifty-five years in prison to be served concurrently with the life sentence. Walker was accused of having beaten and strangled to death Derek Scott of Louisville, a man who resided with Lisa Thomas, Walker's estranged girlfriend and the mother of his four children. Walker admitted the killing, which his children witnessed, but he argued that it amounted to manslaughter rather than murder. He now raises three issues on appeal. He claims that the trial court erred (1) by permitting the video recording of his police interview to be shown to the jury; (2) by advising the jurors, before opening statements how they might go about assessing the credibility of witnesses; and (3) by mis-instructing the jury with regard to the alleged burglary. Finding no reversible error, we affirm.

### RELEVANT FACTS

In addition to the recording of Walker's statement to the police, the Commonwealth's proof included testimony by three of the children who were present at the time of Walker's assault upon Scott, and by Lisa Thomas, Walker's former girlfriend, at whose residence on Fordson Way in Louisville the assault occurred. This proof tended to show that Walker and Thomas had lived together and had had their children during the 1990s, but that sometime around 2002 they had become estranged. Walker then moved with the children to Georgia, where they lived with Walker's mother. Lisa Thomas regained custody of the children in 2006. In about March of 2007, Thomas began seeing Derek Scott, and in about June of that year they moved in together at the Fordson Way apartment. According to Thomas, Scott helped her with the housework, with the cooking, and with the care of the children. Sometime that spring or summer, Walker returned to Louisville from Georgia. According to his police statement, he saw his children a couple of times and was making some effort to reestablish a relationship with Thomas. He spent several hours with her on September 14, 2007, but at some point friction developed and Thomas left him at a cousin's house.

At about 5:00 the following morning, Walker entered the Fordson Way apartment and found Scott asleep in the master bedroom with the children. Three of the children were sleeping on the bed with Scott, and one was sleeping on a palette beside the bed. According to Walker's police statement, at the sight of his children in the same bed with Scott, he "lost it" and attacked Scott. One of the children testified to being awakened by a fight between the two men, and another testified that he came from the bathroom and saw the men fighting. At Scott's urging, the two older ones sought help from Scott's cousin who lived nearby, but they were unable to rouse him. When they returned home, they saw Scott lying motionless on the bedroom floor. Walker chided them for not being on his "team" and told them at one point that they had seen and heard nothing. He later told them to say that Scott had raped them.

They testified that Walker then looped a belt around Scott's neck and dragged him down the steps to the basement. From the basement they heard loud noises, and a short time later Walker came back upstairs.

Thomas testified that she had gone out about midnight and returned home at about 6:00 the morning of September 15. She described being surprised at the door by Walker and his taking her to the basement, where she saw Scott's body lying on the laundry room floor and saw blood spattered "everywhere," on the walls and even on the ceiling. She testified that Walker insisted that Scott was not dead, but only unconscious, and that he would not let her call 911. Eventually, however, Walker fell asleep on the living room sofa. Thomas then fled with the children to her uncle's house, and her uncle summoned the police.

The Commonwealth's proof also included testimony by the medical examiner, who opined that Scott died from multiple blunt force injuries to the head and from strangulation. Police testimony confirmed Thomas's description of the bloody laundry room.

As noted, in light of the Commonwealth's proof, the jury found Walker guilty of intentional murder, of first-degree burglary, and of the various tampering and intimidation offenses. Seeking relief from all of his convictions, Walker contends that his trial was rendered unfair by the admission into evidence of his recorded police statement. We begin our analysis with this allegation of error.

## ANALYSIS

**I. The Admission Into Evidence of Walker's Statement to an Investigator, Including the Investigator's Questions and Comments, Did Not Amount to Palpable Error.**

When the police arrived at Thomas's apartment, Walker was still asleep on the sofa and was soon taken into custody. He was duly advised of his *Miranda* rights and was interviewed that evening by a homicide detective. The interview lasted slightly more than two hours, and the transcript of it fills some 175 typed pages. Walker initially told the detective about his return to Louisville and his gradual resumption of a tenuous relationship with Thomas. He claimed to have been with her most of the preceding day into the wee hours of that morning. He was surprised, he claimed, when she left him at his cousin's house, as he had expected her to wait for him, and so he got a ride to her apartment to find out why she had left. He found the door unlocked, entered, and discovered Scott sleeping with the children. He admitted becoming enraged and attacking Scott, but claimed that before he did so two of the children told him that Scott had molested them. He described his "tussle" with Scott as more-or-less a fist fight that began in the bedroom and wound up in the basement, where, he claimed, he left Scott unconscious but alive.

The detective told Walker that this account did not jibe with what the children had told the police or with the evidence found at the scene, and urged him to be more honest. In response to particular questions, Walker told a slightly different story, and again the detective confronted him with what the detective maintained was inconsistent evidence. That was the pattern of the interview for the full two hours: Walker's statement; the detective's insistence that the statement could not be true; the detective's urging Walker, for his own sake and for the sake of his children, to be honest; and then Walker's revised statement. Gradually Walker admitted, more-or-less, that the children had not accused Scott of sexual contact or at

least not until after the violence; that he had perhaps choked Scott; that he had dragged Scott toward the basement steps with a belt, although Walker claimed that the belt had been around Scott's wrists and not his neck; and that he had kicked Scott as well as punched him. Never, though, did he admit knowing, before being told by the police, that Scott was dead. Walker denied that he intended to kill Scott.

In urging Walker to be more forthcoming and to admit that jealousy rather than concern for the children's safety had prompted his conduct, the detective confided that his ex-wife had remarried and that he well understood how painful it can be to see another man occupying one's place as spouse and parent. In response to that confidence, Walker retreated somewhat from his claim that the children had accused Scott of abusing them.

Prior to trial Walker sought to have the entire interview excluded from evidence on the ground that many of his statements in the course of it were not inculpatory and so were not admissible under Kentucky Rule of Evidence (KRE) 804(b)(3). That rule excepts from the general rule disallowing hearsay evidence, KRE 802, certain statements, including statements tending to subject the declarant to criminal liability where corroborating circumstances clearly indicate the statements' trustworthiness. As a party opponent, however, Walker's interview statements were admissible under KRE 801A (b), which does not require that such statements be against the declarant's interest. *Cf. United States v. McDaniel*, 398 F.3d 540 (6th Cir.2005) (construing and distinguishing the virtually identical federal rules); *United States v. DiDomenico*, 78 F.3d 294 (7th Cir.1996) (same).

Conceding this point, Walker has changed tack and now argues that the interview should have been excluded because much of it consisted not of his statements but those of the detective, statements, as noted, accusing Walker of lying, statements commenting on other evidence, and statements relating to the detective's personal life. Walker takes exception in particular to the detective's personal remarks and insists that they should have been excluded because they were irrelevant. This specific issue was not preserved at trial, and our review is therefore limited under either KRE 103(e) or Kentucky Rule of Criminal Procedure (RCr) 10.26 to asking whether admission of the interrogation video was palpably erroneous resulting in manifest injustice. Walker contends that the admission of the detective's blatantly irrelevant remarks about his own personal life was clearly erroneous and that the cumulative effect of the detective's statements over the course of the two hour video colored the jury's perception of the evidence actually introduced, resulting in manifest injustice. We disagree.

As the parties note, in *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky.2005), we upheld the admission of an interrogation tape in which the police interrogator, as is commonly done, accused the suspect of lying. The full statement, complete with the interrogator's comments on the defendant's veracity and "shifting, inconsistent story" was admissible, we held, not as an expression of the interrogator's actual opinion about the defendant's credibility, but as a verbal act providing context for the suspect's responses. *Id.* at 19.

Almost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool. And because such comments are such an integral part of the interrogation, several courts have noted that they provide a necessary con-

text for the defendant's responses. We agree that such recorded statements by the police during an interrogation are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes. We also agree that retaining such comments in the version of the interrogation recording played for the jury is necessary to provide a context for the answers given by the suspect.

*Id.* at 27.

Similar reasoning applies here. To be sure, as Walker insists, the detective's personal life had nothing to do with this case. The video segments during which the detective made personal references, however, were not offered for their truth as proof about the detective's personal life. They were offered, rather, as proof of verbal acts in the context of an interrogation; they were meant to elicit and did elicit responses from Walker. As such they helped give meaning to Walker's responses and insight into why his story evolved as it did. The detective's remarks were relevant then, not because of anything they may have said about the detective, but because of what, in conjunction with Walker's responses, they showed about Walker and what may have been his state of mind before and at the time of the killing.

■ The trial court did not err, therefore, by admitting those segments of the interrogation during which the detective described his personal feelings. That is not quite the end of the matter, however. We recognized in *Lanham* the risk that the jury might give substantive credit to an interrogator's statement admitted only as evidence of context. To minimize that risk, we held that the defendant was entitled to have the jury admonished, before the statement was introduced, that the statement was being "offered solely to provide context to the defendant's relevant responses." 171 S.W.3d at 28. We further held, however, that the burden of requesting such an admonition is on the defendant and that the failure to make the request will be deemed a waiver. *Id.* The trial court did not give such an admonition in this case, but since Walker did not request one, he is entitled to relief only if the detective's personal remarks were so likely to be misapplied by the jury that an admonishment would clearly have been futile, and then only if the remarks were so prejudicial as clearly to have affected the result. Neither condition is satisfied. Even without an admonishment, the jury would readily understand that the detective's personal remarks were employed only in an attempt to establish rapport with Walker and to encourage him to be forthcoming. Nor were those remarks at all likely to have influenced the jury's findings, which had overwhelming support in the other evidence.

■ Walker offers only one other specific example of statements by the detective on the interrogation recording which allegedly constitute palpable error. He notes that all three children testified at trial that Walker and Scott were already fighting when they, the children, first became aware of the struggle. However, in questioning Walker, the detective twice mentioned that two of the children had indicated that Walker "got into the house somehow and choked him [Scott] while he was asleep." As with the detective's accusations of lying in *Lanham* and the detective's references to his personal situation in this case, the detective made these comments in the course of questioning Walker about the night's events. Walker could have asked for an admonition that the comments were offered only to provide context to the responses and were not themselves evidence. *Lanham,* 171 S.W.3d at 28. Not having requested this

admonition, Walker now claims it would have been futile. He insists it would have been unreasonable to expect the jury to distinguish between the children's testimonies and the detective's interrogation tactics, even if the trial court so instructed them. We disagree. A jury certainly can understand the difference between a child witness's firsthand testimony about the assault and the context-setting questions and comments of the detective who is trying to elicit the suspect's statement about the same event. The detective plainly was not there, he is not a witness and his interrogation comments are not evidence about what actually occurred or even about what another eyewitness actually said. Moreover, to the extent Walker thought an admonition alone would be insufficient to protect his interest on this score, all of the children testified and were subject to cross-examination on this precise issue. In short, the error, if any, in either admitting these comments or in omitting an admonition about a restriction on their use was simply not palpable. Given the totality of the Commonwealth's proof, Walker was not unduly prejudiced nor was his trial rendered manifestly unjust by these comments alone or in conjunction with the remainder of the recorded statement.

## II. The Trial Court's Opening Remarks Concerning the Assessment of Witness Credibility Were Not Palpably Erroneous.

 Walker also contends that his trial was rendered unfair by comments the trial court made to the jury immediately prior to the attorneys' opening statements. Having sworn in the jury, the trial court sought to orient it by providing what the court styled a "roadmap" of the proceedings. The court briefly described the phases of the trial and the roles of the participants. In explaining the jury's role as the finder of fact, the court noted that the jury was the sole arbiter of the weight to be given the various pieces of evidence and the sole judge of the various witnesses' credibility. The court then advised the jury that a witness's credibility might be assessed by considering such factors as the witness's interest or lack of interest in the outcome of the proceeding, the clarity of the witness's recollection, the witness's demeanor, his or her opportunity for observation, and the overall reasonableness of the witness's testimony. Walker maintains that this latter advice purporting to tell the jury how to carry out its role amounted to a judicial invasion of the jury's province and thus undermined the integrity of his trial. Again, Walker did not preserve this issue by means of a timely objection, and so our review is limited under RCr 10.26 to asking whether the "how to" portion of the trial court's preamble was clearly improper, prejudiced Walker, and was so contrary to our ideal of fair and impartial proceedings as to be manifestly unjust. *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky.2010). Walker attempts to evade this strict standard by asserting that the trial court's error was of constitutional magnitude—a violation of sections 7 and 11 of the Kentucky Constitution—but even alleged constitutional errors, if unpreserved, are subject to palpable error review. *Jones v. Commonwealth*, 319 S.W.3d 295, 297 (Ky. 2010). Since the alleged error here does not meet the palpable error standard, it does not entitle Walker to relief.

As Walker correctly notes, in jury trials the practice in Kentucky, since statehood it appears, has been to disapprove judicial comment on the evidence and to leave exclusively to the jury the finding of facts. *Allen v. Kopman*, 32 Ky. 221, 2 Dana 221 (1834); *Howard v. Coke*, 46 Ky. 655, 7 B.Mon. 655 (1847); *Cross v. Clark*, 308 Ky. 18, 213 S.W.2d 443 (1948); *Allen v. Com-*

*monwealth,* 286 S.W.3d 221 (Ky.2009). Although we reject Walker's suggestion that this practice of eschewing judicial comment is a constitutional requirement,[1] it is nevertheless firmly rooted in our common law, as noted, and in our rules. RCr 9.54 and 9.58, for example, provide that the court shall decide and instruct on questions of law. Implicit in those provisions is the understanding that questions of fact are for the jury.

Notwithstanding, then, the broad discretion accorded trial courts to control the proceedings before them, *Transit Authority of River City (TARC) v. Montgomery,* 836 S.W.2d 413 (Ky.1992), and the obvious desirability of giving jurors at the outset of trial some idea of what to expect and what will be expected of them, we agree with Walker that the trial court's instructions regarding how credibility is to be assessed strained, at least, the line judicial comment is not to breach. In *Stewart v. Commonwealth,* 9 Ky.Op. 793, 794 (1877), our predecessor Court considered an instruction the trial court had given at the close of proof, in which

the jury were told that they were the judges of the credibility of the witnesses and the weight of the evidence, and in determining these questions they should take into consideration the demeanor of the witnesses on the witness stand, their intelligence or want of intelligence, the relation to or interest in the prosecution or defense, the opportunities or want of opportunities of knowing the facts about which they testified, and that by these tests, and from all the facts and circumstances allowed to go into evidence, they should give to the evidence such weight as they might believe it entitled to.

Although not faulting this instruction as an incorrect statement of the law, the Court nevertheless reversed the appellant's murder conviction because by specifying factors the jury was to consider the instruction risked emphasizing certain items of evidence and suggesting to the jury the court's attitude toward certain witnesses. The "safer and a better practice," the Court concluded, was "to withhold instructions upon matters relating to the credibility of witnesses and the weight of evidence,

1. Section 11 of our Constitution guarantees criminal defendants prosecuted by indictment or information "a speedy public trial by an impartial jury of the vicinage." Judicial comment threatens not the impartiality of the jury, however, which is sought to be assured by voir dire, but possibly the jury's independence. Section 7 of our Constitution provides that "[t]he ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this Constitution." The "ancient mode" of trial by jury is generally regarded as the common law practice in England, and particularly that practice immediately prior to the adoption of the federal constitution. *Wendling v. Commonwealth,* 143 Ky. 587, 137 S.W. 205 (1911). It so happens that the English common law judges regularly commented on the evidence, even to the extent of offering their opinions to the jury as to weight and credibility. Renee Lettow Lerner, *The Transformation of the American Civil Tri-* al: *The Silent Judge,* 42 Wm. & Mary L.Rev. 195 (Oct.2000). A plausible argument can be made, therefore, that far from prohibiting judicial comment, Section 7 guarantees it. Robert O. Lukowsky, *The Constitutional Right of Litigants to Have the State Trial Judge Comment Upon the Evidence,* 55 Ky. L.J. 121 (1966–67). Neither our predecessor Court nor this one, however, has ever read the constitutional provisions as dictating the details of jury practice beyond the requirements, in felony cases, that the jury consist of twelve persons and that its verdict be unanimous. *Short v. Commonwealth,* 519 S.W.2d 828 (Ky. 1975) (quoting from *Wendling, supra* ). *But see Lucas v. Commonwealth,* 118 Ky. 818, 82 S.W. 440 (1904) (holding that the court may not direct a verdict of guilty in a criminal case and opining that rules under the old Criminal Code assigning matters of law to the court and matters of fact to the jury were in furtherance of Section 7). We decline to depart from that reading here.

or the rules by which the jury should be governed in passing upon either." *Stewart*, 9 Ky.Op. at 795.

Similarly, in *Barnett v. Commonwealth*, 84 Ky. 449, 1 S.W. 722 (1886), the Court addressed an instruction providing that

> [t]he jury are the sole judges for themselves of the weight of the testimony and credibility of the witnesses, and may attach such weight to any and all parts thereof as they may think proper, and if they believe that any witness or witnesses have willfully sworn falsely as to any material fact, they may, if they deem proper, disregard the entire testimony of such witness or witnesses.

*Barnett*, 1 S.W. at 723. "Theoretically, this is all true," the Court allowed, "and yet this Court has repeatedly condemned such an instruction, because it in effect invades the province of the jury." *Id.*

Here, of course, the trial court's advice about assessing credibility came before rather than after the witnesses had testified, and no doubt that lessened the risk that the instruction might be perceived as inviting scrutiny of any witness's testimony in particular. Here, too, the trial court took scrupulous care to impress upon the jury that it intended no comment on the evidence and that the jury was to disregard anything that might seem like such a comment. Walker has suggested no way in which the court's pre-opening statement witness credibility remarks might have distorted the jury's findings. We cannot say, then, notwithstanding the tension we have noted between the trial court's practice here and the practice Kentucky courts have long observed, that the court's advice about assessing credibility amounted to a palpable error. Our case law does not appear to have addressed this sort of pre-opening instruction, so we cannot say that the trial court clearly or palpably abused its discretion. Moreover, Walker does not

appear to have been prejudiced by the court's comments, much less substantially so; indeed, it cannot reasonably be maintained that the court's facially neutral and carefully chosen comments rendered Walker's trial manifestly unjust. Therefore, Walker is not entitled to relief on this ground.

### III. The Burglary Instruction Did Not Allow For a Non–Unanimous Verdict.

Finally, Walker challenges his burglary conviction as not being founded on a unanimous verdict. The jury was instructed as follows:

> You will find the defendant, Ronny D. Walker, guilty under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:
>
> (A) That in this county, on or about the 15th day of September 2007, the defendant entered or remained in a building located at 4229 Fordson Way without the permission of Derek Scott or any other person authorized to give such permission; AND
>
> (B) That in so doing, he knew he did not have such permission; AND
>
> (C) That he did so with the intention of committing a crime therein: AND
>
> (D) That when in effecting entry or while in the building or in immediate flight therefrom,
>
> (1) He caused physical injury to Derek Scott; AND/OR
>
> (2) He used or threatened the use of a dangerous instrument against Derek Scott.

This instruction adheres to the model first-degree burglary instruction. Cooper and Cetrulo, *Kentucky Instructions to Juries—Criminal*, § 5.07 (2010). Walker focuses his attack on part (A), and in partic-

ular on the requirement that he be found to have entered or to have remained in Thomas's Fordson Way apartment "without the permission of Derek Scott or any other person authorized to give such permission." Walker contends that this requirement sets up alternative theories of the offense, one in which Scott denies him permission to enter or remain and one in which someone else does. Since there was no evidence that Scott ever denied permission or had authority to do so, Walker's argument runs, the instruction permitted a guilty verdict based on an unsupported theory.

We think it sufficient to observe that the phrase Walker attacks does not create a true alternative. It requires only that the jury find that no one with the authority to do so, including Scott if he happened to be one of those persons, gave Walker permission to be on the premises. That finding was amply supported by the record. While it might be complained that the reference to Scott is redundant, the redundancy did not confront the jury with an unsupported theory of the crime.

### CONCLUSION

In sum, Walker received a fundamentally fair trial. Neither the admission into evidence of his entire interrogation video, nor the trial court's credibility comments prior to opening statements can be said to have amounted to palpable error. While we do not hold that the Commonwealth has *carte blanc* to introduce as evidence of context any and all statements an interrogator might make in the course of an interrogation, absent specific objections we cannot say that the admission of the interrogator's statements in this case denied Walker a fair trial. Nor are we persuaded that the trial court's unobjected-to opening remarks so encroached upon the jury's independence that the integrity of Walk-

er's trial was in any way called into question. Walker's burglary conviction, finally, was not tainted by an unsupported alternative instruction. Accordingly, we affirm the May 13, 2010 Judgment of the Jefferson Circuit Court.

All sitting. All concur.