RENDERED:  AUGUST 27, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0147-MR

JORDAN GLENN												APPELLANT

v.								APPEAL FROM JEFFERSON CIRCUIT COURT
								HONORABLE AUDRA J. ECKERLE, JUDGE
								ACTION NO. 17-CR-003326

COMMONWEALTH OF KENTUCKY										APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  GOODWINE, McNEILL, AND L. THOMPSON, JUDGES.

McNEILL, JUDGE:  Jordan Glenn ("Glenn") appeals from a judgment of the

Jefferson Circuit Court finding him guilty of reckless homicide and sentencing him

to five years' imprisonment.  Upon careful review, we affirm.

In early October 2017, Glenn began dating a woman named La'Genia

Henry ("Henry").  Henry had a daughter, E.P., who was 17 months old at the time.

Henry and E.P. shared an apartment with Henry's friend, Cierra Leonard

("Leonard") and her two children. About two weeks after the relationship began, Glenn offered to babysit E.P. while Henry worked.

On the morning of October 24, 2017, Henry left for work at 8:38 a.m. Glenn and E.P. were still asleep in Henry's bed. Before leaving, Henry changed E.P.'s diaper and tucked her into the covers. She also prepared a bottle for Glenn to give E.P. when she awoke. Leonard left for college around 10:30 a.m., leaving Glenn and E.P. alone in the apartment. Henry testified at trial that E.P. had been fine the previous night; although a "little fussy" and "clingy" because her gums had been bothering her, she had eaten dinner and played with the other kids.

Glenn stated that he woke up at 1:30 p.m. to a woman knocking at the door, looking for Leonard. E.P. followed him to the door, crying, and so he put her back into bed. Glenn said he then put on his clothes and walked to the store. He estimated he was gone between five and ten minutes. When he returned, he gave E.P. her bottle and changed her diaper. He left her in the bedroom, sleeping. Glenn played video games and watched a movie and returned to check on E.P. around 2:30 p.m.

Henry arrived home sometime before 4:00 p.m. She was surprised when E.P. did not run to greet her, however, Glenn told Henry that E.P. had recently laid down for a nap. Henry peaked inside the bedroom and confirmed E.P. was asleep. Leonard arrived home from school shortly after Henry to change

her clothes and then left for work. Henry and Glenn finished watching the movie and fell asleep on the couch.

Awaking around 7:40 p.m., Henry went to check on E.P. When she turned the bedroom light on, E.P. did not respond. She then touched the back of E.P.'s head and still E.P. did not wake. Henry rolled E.P. over and saw that E.P.'s face and lips were discolored. Her body was cold, and her limbs were stiff.

Henry woke Glenn, and he tried performing CPR on E.P. Henry then called Leonard and 911. Because Henry was hysterical, Glenn spoke with the responder, who offered to talk Glenn through performing CPR. However, upon learning E.P. was cold and stiff, the responder commented she was likely beyond all help. Officer Christopher Mostek, one of the first to arrive on scene, testified he found E.P. on the floor in the bedroom, deceased.

The next morning, Dr. William Ralston, the chief medical examiner for the Commonwealth, conducted an autopsy. E.P. had injuries to her lips and frenulum, as well as a contusion on her chest, all indications of blunt force trauma. E.P. also had internal injuries consistent with blunt force trauma, including hemorrhages to the inside of her scalp on the front and back of her head. Based upon these injuries, Dr. Ralston testified that E.P. suffered at least two impacts to her head. E.P.'s brain also had a subdural hemorrhage caused by an acceleration/deceleration of her head.

E.P. further sustained fractures to her ribs as well as a fractured spinal column. The fractured spinal column would have immediately prevented E.P. from walking or standing upright. Dr. Ralston testified that E.P.'s injuries were similar in severity to those seen in motor vehicle accidents. He opined the injuries to E.P.'s head could have been caused by a hand, and the injury to her spine was consistent with being thrown up against a piece of furniture.

Dr. Ralston stated E.P.'s injuries were inflicted and not accidental. He further testified the injuries occurred around the time of E.P.'s death. Dr. Ralston testified E.P.'s cause of death was blunt force trauma and the manner of death was homicide.

On November 6, 2017, a Jefferson County Grand Jury indicted Glenn for murder. The trial was held December 9-13, 2019. Following the evidence, the jury acquitted Glenn of murder but found him guilty of reckless homicide. The circuit court sentenced Glenn to a maximum term of five years' imprisonment. This appeal followed. We set forth additional facts as necessary below.

Glenn argues on appeal that the trial court erred in allowing the Commonwealth to play a portion of his recorded interview where a detective demonstrated on a doll the types of actions that could have caused E.P.'s injuries. Glenn argues the detective was unqualified to offer this opinion, the demonstration was not relevant, and it violated his Sixth Amendment right of confrontation. He

-4-

further contends the trial court erred in admitting three autopsy photographs, arguing they were unduly prejudicial.

Glenn acknowledges his first argument is unpreserved. Therefore, he requests palpable error review. "We will reverse under the palpable error standard only when a 'manifest injustice has resulted from the error.'" *Baumia v. Commonwealth*, 402 S.W.3d 530, 542 (Ky. 2013) (citing RCr[1] 10.26). "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006). "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Id.* at 5.

During Glenn's final interview with law enforcement, Detectives Holly Hogan and Yolanda Baker gave Glenn a doll for him to demonstrate how he laid E.P. down for her nap. He also demonstrated how he performed CPR. Later in the interview, the detectives confronted Glenn with the nature of E.P.'s injuries, trying to get him to confess to how they occurred. They argued Glenn's reenactment could not explain E.P.'s injuries.

---

[1] Kentucky Rules of Criminal Procedure.

To demonstrate the required force necessary to cause E.P.'s injuries, Detective Baker picked up the doll and said, "when someone picked E.P. up, this is what they did, to cause [her injuries]," and shook the doll forcefully. She then explained that since E.P. was only eighteen months old, it would not have even required that much force. Detective Baker shook the doll again three times, less forcefully, placed it down hard on the table, then flipped it over and placed it down hard again, face first. Glenn responded, "It wasn't anything like that, for real." During trial, the Commonwealth played for the jury the entire recording of Glenn's interviews, including the above demonstration.

While not exactly on point, we believe *Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky. 2005), is instructive in evaluating Glenn's claims. In that case, the Kentucky Supreme Court upheld the admission of an unredacted recording of a police interrogation in which the officer accused the defendant of lying. The recording was admissible "not as an expression of the interrogator's actual opinion about the defendant's credibility, but as a verbal act providing context for the suspect's responses." *Walker v. Commonwealth*, 349 S.W.3d 307, 311 (Ky. 2011) (citing *Lanham*, 171 S.W.3d at 19).

The Court explained:

> By making such comments, the officer is not trying to convince anyone–not the defendant (who knows whether he or she is telling the truth), other officers, a prosecutor, or the jury–that the defendant was lying. Rather, such

comments are part of an interrogation technique aimed at showing the defendant that the officer recognizes the holes and contradictions in the defendant's story, thus urging him or her to tell the truth.

This last point is perhaps most important, at least for the purpose of developing a rule that will address future instances of similar evidence.

*Lanham*, 171 S.W.3d at 27.

Similar reasoning applies here. Detective Baker's demonstration of the type of handling necessary to cause E.P.'s injuries was an interrogation technique designed to elicit a response from Glenn and get him to tell the truth about what happened to E.P. Prior to shaking the doll, Detective Baker told Glenn, "Do you have questions about how this happened? . . . You are a smart young man. You know that this is something that, you can't just pick a child up, lay [them] down, and then, they just die."

By shaking the doll, Detective Baker was not trying to convince Glenn, or the jury, how E.P.'s injuries occurred. She was confronting Glenn with the fact that his description of how he had handled E.P. could not explain E.P.'s injuries. As further evidence that the purpose of Detective Baker's demonstration was not to opine on how E.P.'s injuries actually occurred, following the demonstration, Detective Hogan said to Glenn, "I have to figure out what happened."

Thus, the recording was not admitted as an opinion, expert or otherwise, on how E.P.'s injuries occurred, but to provide context for Glenn's answers, and it was relevant for that purpose. While *Lanham* recognized the risk that a jury might give substantive weight to an interrogator's comments admitted only for evidence of context, it concluded the appropriate remedy, rather than making the statements inadmissible, is for the trial court to supply an admonition that the statement is being "offered solely to provide context to the defendant's relevant responses." 171 S.W.3d at 28.

Here, Glenn did not request any admonition, and failure to request the admonition waives the error. *Id.* Further, even without an admonishment, the jury would have easily understood that Detective Baker's demonstration was not an opinion on how E.P.'s injuries occurred, but was merely an attempt, in the context of an interrogation, to get Glenn to confess to how he had actually handled E.P.

Even if we were to conclude the demonstration was admitted in error, it did not result in manifest injustice, and thus did not amount to palpable error. The evidence against Glenn was strong, making it unlikely that Detective Baker's demonstration on the doll influenced the verdict. Dr. Ralston testified extensively about the severity of E.P.'s injuries, comparing them to motor vehicle accident victims. He testified E.P. had multiple head injuries, broken ribs and a fractured spine. He further testified these injuries were inflicted and not accidental. E.P.'s

injuries were not consistent with Glenn's description of what happened, and Glenn was the only person to interact with E.P. around the time of her injuries and death. And, as noted above, we believe the jury would have understood Detective Baker's demonstration was an attempt to get Glenn to explain how E.P.'s injuries occurred and not an opinion of how E.P.'s injuries actually occurred.

Additionally, failing to redact Detective Baker's demonstration did not violate Glenn's confrontational rights. "*Crawford* holds that when an out-of-court 'testimonial' hearsay statement of a declarant who is unavailable for cross-examination is introduced into evidence, a defendant's Sixth Amendment right to confront witnesses against him is violated." *Beard v. Commonwealth*, 581 S.W.3d 537, 540 (Ky. 2019) (citing *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).

A similar argument was addressed by our Supreme Court in *King v. Commonwealth*, 554 S.W.3d 343, 362 (Ky. 2018). In that case, the defendant argued the trial court violated his Sixth Amendment right to confrontation by playing the victim's recorded child advocacy center interview when the interviewer was not called to testify. Citing its unpublished case, *Clay v. Commonwealth*, No. 2012-SC-000421-MR, 2014 WL 4160134, at *5 (Ky. Aug. 21, 2014), the Court held that the defendant's confrontation rights were not violated because the interviewer's statements were not offered for the truth of the

matter asserted but were an interview technique designed to encourage the victim to provide more detail.

The Court quoted at length from *Clay* which had similarly held a forensic interviewer's statements were not a violation of the defendant's confrontation rights because they were not hearsay, but instead offered to provide context to the victim's statements. Here, Detective Baker's demonstration was not offered to prove the truth of the matter asserted, *i.e.*, how E.P.'s injuries occurred, but was part of an interrogation technique aimed at getting Glenn to confess to such. Because the demonstration was not admitted for hearsay purposes, Glenn's right to confrontation was not violated and no palpable error occurred.

Finally, Glenn argues the trial court erred in admitting three autopsy photographs because they were unduly prejudicial. We disagree. "An appellate court's standard of review for admission of evidence is whether the trial court abused its discretion." *Brewer v. Commonwealth*, 206 S.W.3d 313, 320 (Ky. 2006) (citation omitted). "A trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Breazeale v. Commonwealth*, 600 S.W.3d 682, 695 (Ky. 2020) (citation omitted).

During Dr. Ralston's testimony, the Commonwealth moved to introduce three autopsy photographs showing (1) the back of E.P.'s head with the skin pulled down to reveal damage to the back of her skull, (2) the front of E.P.'s

-10-

head with the skin pulled forward showing damage to the front of her skull, and (3) the inside of E.P.'s body cavity, without the organs, showing damage to her ribs and spinal column. Dr. Ralston used these photographs during his testimony to explain his findings as to the cause and manner of E.P.'s death.

During a bench conference, Glenn objected the autopsy photos had little probative value and would only serve to inflame the jury. The Commonwealth responded the photos were proper evidence of E.P.'s injuries, showing the evidence of impact to E.P.'s skull as well as her severed spine. The trial court agreed with the Commonwealth that the photos were evidence of E.P.'s injuries and admitted the photos over Glenn's objection.

"As a general rule, photographs of a gruesome or graphic nature are not rendered inadmissible solely because of their gruesomeness." *Ragland v. Commonwealth*, 476 S.W.3d 236, 248 (Ky. 2015) (citation omitted). "Under this rule, we have many times upheld the Commonwealth's use of autopsy photographs introduced in conjunction with a medical examiner's testimony concerning the cause and manner of a homicide victim's injuries and death." *Staples v. Commonwealth*, 454 S.W.3d 803, 825 (Ky. 2014) (citations omitted).

Glenn contends the probative value of the three autopsy photos was outweighed by their risk of inciting emotionalism in the jury. He argues Dr. Ralston's testimony was sufficient to establish E.P.'s injuries, which were not in

-11-

dispute.  In support, Glenn cites *Hall v. Commonwealth*, 468 S.W.3d 814 (Ky. 2015).

That case concerned the trial court's admission of 28 crime scene and autopsy photographs.  In reversing the trial court, our Supreme Court made clear there is little evidentiary value, and increasing risk of prejudice, in multiple photographs establishing the same injuries:

> Some of the photographs in question were admissible to allow the Commonwealth to prove the *corpus delicti,* as they showed both the crime scene and the devastating wounds suffered by the victims.  But admission of the entire proffer of 28 photos went well beyond that.  While a few photos necessary to show the commission of the crimes and the nature of the victims' injuries were properly admitted, the numerous photos introduced thereafter were cumulative and added little, if any, persuasive force to the other evidence proving the crime and the circumstances surrounding its commission.  At the same time, the corresponding danger of inflaming the passions of the jury to the prejudice of Hall's affirmative defenses skyrocketed from the admission of these voluminous and incredibly gruesome images.

*Id.* at 826.

The facts in *Hall* are clearly distinguishable from this case.  Here, the Commonwealth only sought to introduce seven out of eighty autopsy photographs.  Further, unlike in *Hall*, the photos were not needlessly cumulative, none of them showing the same injury.  And the trial court reviewed the photos individually rather than admitting them *in toto* as in *Hall*.

The photographs were relevant and highly probative to show the nature of E.P.'s injuries. Dr. Ralston used them during his testimony to explain the types and degrees of E.P.'s injuries as well as explain the likely cause and manner of her death. They were further relevant to show the severity of E.P.'s injuries, supporting Dr. Ralston's testimony her injuries were inflicted and not accidental.

As to prejudice, while the photos are gruesome, as autopsy photos inherently are, they are not so inflammatory as to substantially outweigh their probative value. Further, the jury acquitted Glenn of murder and instead, convicted on the lesser charge of reckless homicide and sentenced him to five years, suggesting the photos did not improperly arouse their emotions. In sum, the trial court did not abuse its discretion in admitting the three autopsy photographs.

For the foregoing reasons, we affirm the judgment and sentence of the Jefferson Circuit Court.

ALL CONCUR.

BRIEF FOR APPELLANT:

Joshua M. Reho
Louisville, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Lauren Lewis
Assistant Attorney General
Frankfort, Kentucky